## UNITED STATES of America

v.

### Joseph COGNATO.

### Crim. No. N–75–153.

United States District Court,
D. Connecticut.

Feb. 10, 1976.

Peter A. Clark, Asst. U. S. Atty., New Haven, Conn., for plaintiff.

John R. Williams, New Haven, Conn., for defendant.

## MEMORANDUM OF DECISION ON DEFENDANT'S MOTION TO SUPPRESS

NEWMAN, District Judge.

Defendant, charged with armed bank robbery, has moved to suppress various items seized from his apartment, some taken at the time of his arrest without a warrant and others taken subsequently by officers executing a search warrant. The right to enter the apartment and the manner of entry are the principal issues.

At 6:12 p. m. on October 31, 1975, the East Haven police were notified of a bank robbery at the Community Banking Center in East Haven. Approximately $6,000 was taken. Inspector Frank Konesky arrived at the bank within minutes and secured information from Arthur Frione, a bank customer, who had witnessed the robbery while waiting in his truck outside the bank. Frione reported he had seen two robbers, one of whom was armed, flee from the bank, had followed them in his truck as they ran, and had seen them enter a Cadillac in which a driver was waiting. Frione reported the license number as PM 3611. Frione also told Konesky the driver of the Cadillac had blond. shoulder-length hair. Witnesses at the bank described the two robbers as small in stature, probably kids.

A police radio bulletin for the Cadillac elicited significant information. Officer Simoni heard the report at home, and immediately recognized the license number as belonging to a car he had twice investigated within the week. He informed Konesky that upon first observing the car, he had been sufficiently suspicious to check the license with the State Motor Vehicle Department. He learned it was registered to the defendant, Joseph Cognato, at a Kenneth Street address in West Haven. On October 30 he again saw the car under circumstances that prompted him to ask the occupants, a male and a female, for a license and registration. They produced a registration listing the owner as Joseph Cognato. The female occupant told Simoni she was Cognato's girl friend and was currently living with him at Apt. 2, 142 Bradford Avenue in East Haven.

The radio report also elicited a telephone call from New Haven police officers. They told Konesky they had been surveilling the Cadillac on October 31 because of a tip from an informant that Cognato, Douglas Wyllie, and a girl were planning a robbery that day. The New

Haven police told Konesky they had seen the Cadillac being driven in New Haven that day and that the occupants were Cognato, Wyllie, and a girl.

Capt. Iaguessa of the East Haven police told Konesky he had arrested Wyllie two weeks previously, at which time Wyllie had stated that one of his close associates was Joseph Cognato. Konesky himself knew Cognato and knew that Frione's description of the driver of the Cadillac fitted Cognato.

Konesky sent Iaguessa and Simoni to the Bradford Avenue apartment, instructing them first to stop by the police station to obtain armament. Konesky subsequently drove toward the Bradford Avenue apartment. On the way, he learned over the radio that Iaguessa and Simoni had observed the Cadillac with license PM 3611 at the apartment. He also learned that the officers at the scene had arrested a youth as he exited the apartment. This turned out to be Wyllie. A search of his person uncovered approximately $2,000, including "bait" money taken from the bank.[1]

Arriving at the scene between 8:00 and 8:30 p. m., Konesky ascertained that no weapon had been found on Wyllie. He also learned that Wyllie had stated that "Joey" and a girl were in the apartment. He also knew that Wyllie had been apprehended within the line of sight from the apartment window. In addition to all of the circumstances already recounted, Konesky knew several things about Cognato. He knew that Cognato had served a sentence for bank robbery, that Cognato had a reputation for involvement with the criminal element, and that Cognato on one prior occasion had been involved in a shooting episode with a weapon in which Cognato injured himself. Konesky concluded that the weapon Frione had seen in the hand of one of the fleeing robbers was in the apartment with Cognato. He also concluded that Cognato should be promptly apprehended and that entry into the apartment should be made without warning to the occupants to avoid what he feared would otherwise be a "shoot-out." Konesky therefore instructed a police officer to try the door handle quietly. Upon learning that the door was locked, Konesky gave instructions to break the door in, and a group of officers entered the apartment.

Inside the apartment Konesky observed Cognato on his bed with a pistol on the bed near him. Upon seeing Cognato move toward the pistol, Konesky pushed Cognato away, seized the weapon, and arrested Cognato. Other officers arrested the girl. The officers then walked quickly through the small apartment to determine if there were other occupants. They found no one else.

While walking through the apartment, which consisted only of a bedroom, bathroom, and kitchen, the officers noticed several items in plain view. These included a soda bottle filled with money in an alcove-type closet (without a door), a clip for the pistol and a box of ammunition, a box of rubber gloves, and money tucked under the bed mattress but visible as the officers returned from the kitchen to the bedroom. The only items seized at this time were the pistol and some money taken from Cognato's person when he was arrested. The other items were photographed.

After taking Cognato and the girl into custody, the police officers prepared an application for a search warrant, which was presented to a state court judge at his home. A warrant for seizure of money was issued. The officers returned with it to the apartment, but did not execute it because, prior to reentering the apartment, they noticed that the apartment number and street address on the warrant were incorrect. They prepared a new application for a search warrant, returned to the state judge's home, and were issued a second search

---

1. The money taken from Wyllie was ascertained to contain "bait" money after the officers entered the Cognato apartment but before they applied for a search warrant for the apartment.

warrant for the seizure of money. They returned to the apartment shortly after midnight and seized the money, the rubber gloves, and the ammunition, which they had previously seen. A search of the apartment disclosed approximately $4,000 hidden in a box in the bathroom. This money, which included "bait" money taken from the bank, was also seized.

■ Defendant initially challenges the officers' action in entering the apartment without an arrest warrant. The issue of whether the Fourth Amendment is violated by "the forceful nighttime entry into a dwelling to arrest a person reasonably believed within, upon probable cause that he had committed a felony, under circumstances where no reason appears why an arrest warrant could not have been sought," *Jones v. United States,* 357 U.S. 493, 499–500, 78 S.Ct. 1253, 1257, 2 L.Ed.2d 1514, 1519 (1958), has been explicitly left unresolved by both the Supreme Court[2] and the Second Circuit.[3] Decisions upholding such an entry have generally focused on exigent circumstances thought sufficient to justify not obtaining a warrant, as well as the strength of the probable cause to believe both that the suspect has committed a felony and that he is located in the dwelling.[4]

The facts here justify the warrantless entry without consideration of what the outcome would be if the stark issue framed in *Jones* were presented. Konesky had overwhelming reason to believe Cognato had been a participant in an armed bank robbery. An eyewitness had seen the fleeing robbers enter his car, and he matched the description of the car's driver. He had been seen that day driving his car with two persons, one of whom was arrested as he left Cognato's apartment within two hours of the robbery with a large amount of cash. Moreover, he was known to have committed a bank robbery on a prior occasion.[5] Konesky's basis for believing Cog-

---

**2.** *See United States v. Watson,* —— U.S. ——, ——, 96 S.Ct. 820, 825, 46 L.Ed.2d 598, 605, 44 U.S.L.W. 4112, 4114 n. 6 (White, J., opinion of the Court), —— U.S. ——, 96 S.Ct. 832, 46 L.Ed.2d 614, 44 U.S.L.W. 4116 (Stewart, J., concurring), —— U.S. ——, 96 S.Ct. 828, 46 L.Ed.2d 610, 44 U.S.L.W. 4118 (Powell, J., concurring) Jan. 26, 1976); *Gerstein v. Pugh,* 420 U.S. 103, 113 n. 13, 95 S.Ct. 854, 863, 43 L.Ed.2d 54, 61 (1975); *Coolidge v. New Hampshire,* 403 U.S. 443, 480–81, 91 S.Ct. 2022, 2045, 29 L.Ed.2d 564, 591 (1971). *But see United States v. Watson, supra,* —— U.S. at ——, 96 S.Ct. at 842, 46 L.Ed.2d at 626, 44 U.S.L.W. at 4125 (Marshall & Brennan, JJ., dissenting).

**3.** *United States v. Mapp,* 476 F.2d 67, 74 (2d Cir. 1973); *see Williams v. United States,* 463 F.2d 1183, 1185 (2d Cir. 1972); *United States v. Gaines,* 460 F.2d 176, 178 (2d Cir. 1972); *United States v. Titus,* 445 F.2d 577, 578 (2d Cir.), *cert. denied,* 404 U.S. 957, 92 S.Ct. 323, 30 L.Ed.2d 274 (1971).

The Court of Appeals for the District of Columbia has held that absent "urgent need" a warrant should be obtained before entering a dwelling for the purpose of arresting a suspected felon. *Dorman v. United States,* 140 U.S.App.D.C. 313, 319, 435 F.2d 385, 390–91 (1970) (en banc).

**4.** *See, e. g., United States v. Watson, supra,* —— U.S. at ——, ——, 96 S.Ct. at 826, 834, 46 L.Ed.2d at 607, 618, 44 U.S.L.W. at 4115, 4119–20; *Warden v. Hayden,* 387 U.S. 294, 298–99, 87 S.Ct. 1642, 1645, 18 L.Ed.2d 782, 787 (1967); *United States v. Mapp, supra; Dorman v. United States, supra.*

Logically, the entry might be viewed as initially a search for and then a seizure of the person. *See United States v. Watson, supra,* —— U.S. at ——, 96 S.Ct. at 829, 46 L.Ed.2d at 610, 44 U.S.L.W. at 4117 (Powell, J., concurring), —— U.S. ——, 96 S.Ct. 837, 46 L.Ed.2d 621, 44 U.S.L.W. 4122 (Marshall & Brennan, JJ., dissenting); *Morrison v. United States,* 104 U.S. App.D.C. 352, 355, 262 F.2d 449, 452 (1958). That view has not dominated the reasoning or affected the results in warrantless entry to arrest cases. *See, e. g., United States v. Artieri,* 491 F.2d 440, 443 (2d Cir. 1974).

**5.** Defendant contends no reliance can be placed on the informant's tip relayed by the New Haven police to the effect that Cognato, Wyllie, and a girl were planning a robbery that day. Neither the reliability of the informant nor the circumstances indicating the reliability of his information were furnished. *See Aguilar v. Texas,* 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964). However, the abundant independent information pointing towards the involvement of Cognato and Wyllie in the robbery corroborates the tip and very likely makes it an appropriate ingredient of probable cause. Even without that ingredient, the probable cause to believe Cognato had committed a felony was strong.

nato was in the apartment was also strong, stemming from the spontaneous report of Wyllie just after he left the apartment.

The exigent circumstances justified if not impelled prompt action. A pistol had been observed during the crime and had not been recovered from Wyllie. Cognato had been known to use a pistol before. Since Cognato had previously served time for bank robbery, the officers could assume he might well take rash action to avoid apprehension. At a minimum this could involve disposing of the robbery money by flushing it down a toilet or even burning it. At worst, he might reasonably be thought ready to take desperate action to resist capture.[6] The police knew a girl was in the apartment, but were not clear as to her circumstances. She was reported to be the suspect's girl friend. Whether she would turn out to be an accomplice, willing or unwilling, or a hostage in an escape attempt was uncertain. Finally, since the officers knew Wyllie had been arrested within sight of the apartment, they could reasonably be concerned that Cognato was already alerted to their presence, and that the lapse of any time would afford him the opportunity to destroy the money, to plan resistance to capture, or both.[7] Posting a guard while a warrant was procured would not lessen the serious risks that evidence would be destroyed or that serious injury would ensue to the girl or to the officers.[8]

■ Defendant further contends that even if the circumstances justified entry without warrant, the entry was unlawful for lack of notice of the identity and purpose of the officers. These requirements, specified by 18 U.S.C. § 3109 for execution of a search warrant, generally apply to an entry to arrest without a warrant, *Miller v. United States,* 357 U.S. 301, 78 S.Ct. 1190, 2 L.Ed.2d 1332 (1958), although circumstances can justify their omission, *Ker v. California,* 374 U.S. 23, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963); *United States v. Mapp, supra.* One such circumstance is a reasonable basis to believe that announcement of identity and purpose will create a substantial risk of injury to police officers or bystanders. *United States v. Smith,* 456 F.2d 1236 (9th Cir. 1972); *United States v. Garcia Mendez,* 437 F.2d 85 (5th Cir. 1971); *Gilbert v. United States,* 366 F.2d 923 (9th Cir. 1966); cf. *United States v. Wylie,* 149 U.S.App.D.C. 283, 462 F.2d 1178 (1972); *Bryson v. United States,* 136 U.S.App. D.C. 113, 419 F.2d 695 (1969); *Jackson v. United States,* 354 F.2d 980 (1st Cir. 1965). While Justice Brennan's concurring opinion in *Ker* limits the exception for peril to those within the premises, 374 U.S. at 47, 83 S.Ct. at 1626, 10 L.Ed.2d at 746, Justice Clark's plurality opinion for the Court explicitly approves the California rule dispensing with notice " 'if the officer's peril would have been increased or the arrest frustrated had he demanded entrance and stated his purpose.' " 374 U.S. at 40, 83 S.Ct. at 1633, quoting from *People v. Maddox,* 46 Cal.2d 301, 306, 294 P.2d 6, 9 (1956). Moreover, the Supreme Court has subsequently referred to the exception in terms of danger to the officers, citing with apparent approval *Gilbert v. United*

---

**6.** Since the officers knew Cognato was confined to a wheelchair, they obviously did not fear he would run away. However, having reason to believe he was armed and knowing he had served a prior bank robbery sentence, they had reason to be concerned that he might either shoot to resist capture or use the girl as a hostage in an escape attempt.

**7.** As in *United States v. Mapp, supra,* the apprehension of a suspect's confederate could reasonably be thought by the police to increase the risk that the suspect would realize he has come under suspicion. This could occur either by the suspect's becoming suspi-

cious that his confederate has not returned, or getting a message from him, directly or relayed through a relative or even an attorney.

**8.** It may be that the information known by Konesky before Wyllie was apprehended was sufficient to apply for both a warrant to arrest Cognato and to search his apartment, but the officers were not obligated to seek process at that point without pursuing their search for the car. Once they found the car at the apartment and found Wyllie leaving that apartment, they were then confronted with new circumstances that required prompt action.

*States, supra,* in *Sabbath v. United States,* 391 U.S. 585, 591, 88 S.Ct. 1755, 1759, 20 L.Ed.2d 823, 834 (1968).

■ Armchair experts may differ as to whether a police officer apprehending a suspect believed to be armed and dangerous incurs less risk by breaking in unannounced or by securing the area and giving notice from a safe distance. Experience has shown that either course can precipitate injury and death. The Fourth Amendment is not the arbiter of this choice of tactics. It safeguards against unreasonable police intrusions. In the circumstances of this case, the police had ample basis for believing that an announced entry would create a risk of serious injury to themselves and perhaps to the female occupant of the apartment.[9]

■ Once lawfully inside the apartment, the officers plainly had the right to arrest Cognato and, incident to that arrest, to seize his gun and money from his person, and to inspect the premises to be sure no one besides the girl was present. In the course of that inspection, no search for evidence was conducted. Nothing was opened. The items ultimately seized, other than the money in the box in the bathroom, were all in plain view and could have been seized at that time as instrumentalities[10] or fruits of the crime.[11]

■ However, the officers elected to obtain a search warrant to seize the items they had seen and to conduct a search, which disclosed the money in the bathroom. Defendant contends the warrant is defective primarily because it was issued in part on the basis of what the officers saw upon their entry into the apartment. As previously discussed, that entry was lawful, and hence no taint arose. Even if the entry had not been lawful, it is far from clear that the warrant would be defective.

The Second Circuit has upheld a search warrant based on an affidavit that referred to information tainted by an earlier illegal seizure where the remaining portions of the affidavit, untainted by the prior illegality, were sufficient to justify issuance of the warrant. *Parts Mfg. Corp. v. Lynch,* 129 F.2d 841 (2d Cir. 1942). See also *United States v. Paroutian,* 319 F.2d 661 (2d Cir. 1963); *United States v. Harris,* 501 F.2d 1 (9th Cir. 1974); *United States v. Bravo,* 403 F.Supp. 297, 303 (S.D.N.Y.1975); *United States v. Halsey,* 257 F.Supp. 1002, 1007 n. 3 (S.D.N.Y.1966); *United States v. Epstein,* 240 F.Supp. 80, 82 (S.D.N.Y. 1965).

The affidavit on which the warrant was issued reported to the state judge that the robbery occurred around 6:00 p. m., that Cognato's car was used by the

9. One hazard of unannounced entry is the risk of unwarranted invasion of privacy into the wrong dwelling, one where the suspect is reasonably believed to be but in fact is not present. That risk was virtually nil in this case, since the co-defendant Wyllie had reported Cognato's presence in the apartment only seconds before the entry.

10. A bank teller had told Konesky one of the robbers wore rubber gloves.

11. Defendant challenges the lawfulness of the observation of the items seen upon the officers' initial entry and their subsequent seizure on the ground that the "inadvertence" qualification set forth in the plurality opinion in *Coolidge v. New Hampshire,* 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971), was not met. Even if there is an "inadvertence" qualification to the "plain view" exception, *see United States v. Santana,* 485 F.2d 365, 369–70 n. 8 (2d Cir. 1973), *cert. denied,* 415 U.S. 931,

94 S.Ct. 1444, 39 L.Ed.2d 490 (1974), it was satisfied here, since the primary motivation of the officers who entered the apartment was to arrest Cognato. *See United States v. Morell,* 524 F.2d 550, 555–56 (2d Cir. 1975). Defendant contends the presence of a police photographer shows the purpose of the entry was to seize evidence. On the contrary, as a matter of sound police procedure, it was entirely appropriate to have a photographer present to record whatever circumstances confronted the officers. Had an injury ensued, photographs would have been useful in a later determination of the facts. As it turned out, the photographer's presence was useful in establishing that some items in the apartment were in fact in plain view. So long as officers enter for the primary purpose of making an arrest, their view of items in plain view does not cease to be inadvertent simply because they had the foresight to be able to record photographically whatever circumstances they might encounter.

fleeing robbers for their getaway, that Cognato, whom the officers knew, resembled the driver as described by Frione, that the car was observed at the Bradford Avenue apartment shortly after the robbery, that Wyllie was apprehended within hours of the robbery as he left Cognato's apartment with a large sum of money, some of which was identified as having been taken in the robbery, and that Cognato had previously been convicted of bank robbery. That information would have justified issuance of a warrant to seize additional money in the apartment, even without the observations made within the apartment.

Defendant also contends that the affidavit is in some respects inconsistent with facts reported to the state judge in the first affidavit, which produced the warrant with the incorrect address. For example, the first affidavit reported that Wyllie was arrested inside the apartment, while the second one correctly reported his arrest outside the apartment. None of the discrepancies vitiated the validity of the warrant. *Cf. United States v. Ventresca,* 380 U.S. 102, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965); *United States v. Bravo, supra,* 403 F.Supp. at 304.

Finally, defendant contends the seizures of the gloves and ammunition were unlawful, since the warrant authorized only a seizure of money. However, the gloves and ammunition were available for seizure upon the initial entry, and the propriety of seizing them cannot be removed by their omission from the subsequently issued warrant. Even if the officers would have lacked authority to reenter the premises without a warrant,

the warrant to search for and seize money validated their return, and they were then entitled to seize instrumentalities of the crime that were still in plain view.

In sum, all of the seizures were lawful, and no violation of Fourth Amendment rights occurred. It may not be amiss to note that even if the police action taken under the circumstances that confronted these officers could be deemed beyond Fourth Amendment limitations, this would appear to be the type of case where the exclusionary rule, already being seriously questioned, see *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics,* 403 U.S. 388, 411, 91 S.Ct. 1999, 2012, 29 L.Ed.2d 619, 635 (Chief Justice Burger, dissenting) (1971); *Coolidge v. New Hampshire,* 403 U.S. 443, 492, 493, 510, 91 S.Ct. 2022, 2051, 29 L.Ed.2d 564, 598 (opinions of Chief Justice Burger, Justice Black, Justice Blackmun) (1971); *Schneckloth v. Bustamonte,* 412 U.S. 218, 250, 93 S.Ct. 2041, 2059, 36 L.Ed.2d 854, 875 (opinion of Justice Powell) (1973), should not be automatically applied. None of the officers in this case took rash or thoughtless action in disregard of reasonably well-defined constitutional standards. On the contrary, they acted prudently, making on-the-scene judgments in an area of the law where standards do not clearly emerge even after careful legal research. Having applied the constitutional standards to their actions, I find no Fourth Amendment violation and therefore deny the motion to suppress. Had I resolved the issues otherwise, I would hesitate before assuming the exclusionary rule today requires automatic suppression under the circumstances of this case. But see *United States v. Karathanos,* 531 F.2d 26 (2d Cir. Feb. 2, 1976).