UNITED STATES of America,

v.

Harold CATTOUSE, Defendant.

No. 86 Cr. 637–CSH.

United States District Court,
S.D. New York.

April 2, 1987.

---

9. Any such motion is to be filed and served within 30 days of the filing of this Memorandum and Order.

Rudolph W. Giuliani, U.S. Atty. for S.D. N.Y., Alfred U. Pavlis, Adam Hoffinger, Asst. U.S. Attys., for the U.S.A.

Caesar D. Cirigliano, The Legal Aid Society, Federal Defender Services Unit, New York City, Leonard F. Joy, of counsel, for defendant.

## MEMORANDUM OPINION AND ORDER

HAIGHT, District Judge:

On May 9, 1986, agents of the United States Drug Enforcement Administration ("DEA") arrested defendant Harold Cattouse in his apartment at 164 West 133rd Street, New York, New York. They had no arrest warrant. Cattouse was subsequently charged with one count of conspiracy to violate the federal narcotics laws, 21 U.S.C. §§ 812, 841(a)(1), (b)(1)(B), and with two counts of distributing phencyclidine ("PCP"), a controlled substance, within 1000 feet of a school, 21 U.S.C. §§ 812, 841(a)(1), 845(a); 18 U.S.C. § 2.

Cattouse now moves to suppress various statements and physical evidence as fruits of an unlawful warrantless nonconsensual [1] arrest in his home. *See Payton v. New York*, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). A two-day evidentiary hearing was held. At the hearing, three agents who participated in the investigation testified. The defendant's ex-girlfriend, who was present at the time of arrest, also testified. Defendant submitted a post-hearing letter brief. The Court, finding that the case presented particular difficulties in the field of warrantless home arrests, directed further submissions on four questions. This Opinion constitutes the Court's Findings of Fact and Conclusions of Law.

I. *Factual Background*

The following material facts were adduced at the hearing. Except as noted, they are not in dispute.

The investigation which led to Cattouse's arrest was initiated by DEA Special Agent Timothy Higgins. Tr. 27, 130. On the evening of May 8, 1986, Higgins was contacted by a confidential informant. The informant, who had supplied Higgins with reliable information in other cases, Tr. 118–21, told Higgins he thought he could arrange a PCP buy in the vicinity of 164 West 133rd Street from one "Yogi." Higgins approved, and the next morning at 7:30 a.m. the informant called to say he had arranged the buy. Tr. 121–23.

Higgins and another agent picked up the informant at his home and drove to the area of West 133rd Street. Higgins gave the informant $300 in Government funds. After about an hour, between 10:30 a.m. and 11:00 a.m., the informant returned with a small bottle of liquid PCP.

In the debriefing that followed, the informant stated as follows. He had entered 164 West 133rd Street with Yogi and proceeded to an apartment on either the second or third floor. Tr. 34. Yogi, as intermediary, knocked on an apartment door. "[A]n individual ... handed Yogi the bottle containing PCP for the $300 in government buy money." Tr. 129, 142–43. The informant and Yogi went into a community bathroom in the hallway. There, Yogi gave the bottle to the informant, who checked the contents. Tr. 31, 133. A "fat black guy" later identified as Cattouse entered the bathroom and assured the informant that the PCP was "good stuff." Tr. 30–34, 143.

It is not entirely clear whether the informant saw Cattouse hand the bottle out from the apartment, or whether he inferred that Cattouse had done so because of Cattouse's appearance in the bathroom to tout the drug's quality. The latter scenario appears more probable. It is derived from agent Howell's description of his and Higgins' debriefing of the informant on May 9

---

which is more precise and detailed than Higgins' account of a conversation he had with the informant earlier that day. *Compare* Tr. 31–34 (Howell) with Tr. 142–143 (Higgins).

The agents and the informant then returned to headquarters. Although they had a general physical description, they had not yet identified the "fat black guy" as Harold Cattouse. However, there is a basis to infer that the agents had a telephone number given to them that morning.[2]

After a short discussion at headquarters around noon, agents decided to try to make a second, larger buy. Tr. 130–31, 134, 147–48. Five agents drove back to the vicinity of 133rd Street with the informant. The informant, armed with $3,000 of fresh Government funds, re-entered 164 West 133rd Street at about 1:50 p.m. The agents, who were all white in a predominantly black neighborhood, set up "limited" surveillance in three cars on adjacent avenues. "At times" they could see the entrance to the 133rd Street building—the agents moved around for fear of detection. Tr. 37–41. The agents had information that there was a large, mobile PCP laboratory in Harlem, and the informant had told them "to be very careful in surveillance because there were lookouts all over the area." Tr. 143. However, the agents never identified any particular individuals as lookouts.

The informant emerged from 164 West 133rd Street after about 25 minutes. As instructed, he walked several blocks north on Lenox Avenue where he met agents Robert Howell and Timothy Higgins. The informant told them he had met with the same "fat black guy" in the same apartment from which Yogi had received the one ounce bottle that morning. The informant described the apartment as a single room with no fire escape or rear exits and one window. Inside were Cattouse, a black female later identified as Kim Morris, and perhaps a young boy. Agent Howell could

not remember whether the agents further probed the informant on the specific location of the apartment within the building at this stage. Tr. 43–46.

The informant further reported that Cattouse had told him he could purchase 16 ounces of liquid PCP for $3,000. Cattouse had then left the apartment to go get the drug, saying he would return shortly. The informant had waited a short while for Cattouse to return, and then had left the building to meet agents Howell and Higgins. Tr. 43–48.

Although the agents surveying the premises had a general description of Cattouse, presumably from the informant's morning rendezvous, none had seen Cattouse leave the premises. Tr. 13, 47. Therefore, after a short wait, the agents asked the informant to go back up to the apartment to try to ask the woman inside when Cattouse would be back, and to try to find out where he had gone. Tr. 13, 48.

The informant's second afternoon visit to the apartment lasted between 15 and 45 minutes. Tr. 13–14, 49. Meeting Howell and Higgins again a few blocks from the apartment, the informant said he had met with the same young woman (Kim Morris), who had said Cattouse was not going far and would be back soon. Morris had not appeared suspicious of the informant, and had simply told the informant to wait for Cattouse. Tr. 15, 50–52.

By this time, Howell knew that the apartment was on the third floor, and that the floor had a community bathroom. At some point the agents learned the floor also had a community kitchen; however, Howell could not recall whether the informant told him so or whether he so observed himself when he made the arrests. Tr. 50–52.

When the agents realized that Cattouse had earlier left the apartment without being seen, two agents positioned themselves closer to the apartment house door. At about 3:10 p.m., these agents saw a man

---

2. Agent Howell's testimony on the point is unclear. He could not say with any confidence whether the informant got the telephone number from Yogi or Cattouse, when the informant was given the number, or when the agents ran their check on the number. Because the burden of proof is on the Government, I resolve these ambiguities in defendant's favor.

matching the "fat black guy's" description enter 164 West 133rd Street with a brown paper bag. Tr. 15, 52, 172. To ensure that Cattouse had returned, the informant accompanied by Higgins telephoned a number Yogi or Cattouse had given him. A woman answered and confirmed Cattouse was back. Tr. 15–16, 53–55, 57, 170–72.

Finally, the informant went back into the apartment house and completed the purchase. After 15–20 minutes, the informant emerged with a brown paper bag containing a 16 ounce soda bottle filled with liquid PCP. Tr. 16, 58, 170–72. The informant again met Higgins and Howell a few blocks away and turned over the bottle. Tr. 16, 58–60. The informant told him a tall black male, later identified as Errol Andrews, was also in the apartment and Morris and another black female were in the apartment and hallway area. Tr. 16–17. The agents then decided to arrest Cattouse. Tr. 138–39, 148. At about this time, the agents surveying the building radioed to Higgins and Howell that "there were people coming in and out of the apartment all the time; other people from the street, people who we hadn't seen before. We didn't have any idea as to their identity or where they were going to or coming from." Tr. 18. Agent Higgins tried to make his way to the rear of the apartment; the others, with Howell in the lead, followed the informant up to Cattouse's apartment. Tr. 18, 20–21. Shortly thereafter, under circumstances which are disputed [3] but concededly without the occupants' consent,[4] the agents entered Cattouse's one-room apartment and arrested him. Tr. 21. The arrest took place at approximately 4:00 p.m. Tr. 172.

Defendant moves to suppress the fruits of that arrest.

## II. *Discussion*

Absent exigent circumstances, the Fourth Amendment bars warrantless arrests in the home. *Welsh v. Wisconsin*, 466 U.S. 740, 741, 104 S.Ct. 2091, 2093, 80 L.Ed.2d 732 (1984) (citing *Payton v. New York*, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980)). The Government, bearing a "heavy" burden of proof, *id.* 466 U.S. at 749, 751–52, 104 S.Ct. at 2098–99, contends exigent circumstances existed in this case.

"The phrase 'exigent circumstances' refers generally to those situations in which law enforcement agents will be unable or unlikely to effectuate an arrest, search or seizure, for which probable cause exists, unless they act swiftly and, without seeking prior judicial authorization." *United States v. Campbell*, 581 F.2d 22, 25 (2d Cir.1978). "The determination of exigent circumstances *vel non* necessarily turns upon whether in light of all the facts of the particular case there was an 'urgent need' that 'justif[ies]' a warrantless entry." *United States v. Martinez-Gonzalez*, 686 F.2d 93, 100 (2d Cir.1982) (quoting *Dorman v. United States*, 435 F.2d 385, 391 (D.C. Cir.1970)). *See also Welsh, supra*, 466 U.S. at 749–50, 104 S.Ct. at 2097–98.

One factor is the gravity of the offense, although that factor alone does not overcome the presumption of unreasonableness that attaches to a warrantless house arrest. *Id.* at 751–53, 104 S.Ct. at 2098–99; *Martinez-Gonzalez, supra*, 686 F.2d at 100. Other factors include: (2) whether the suspect "is reasonably believed to be armed"; (3) "a clear showing of probable cause ... to believe that the suspect committed the crime"; (4) "strong reason to believe that the suspect is in the premises being entered"; (5) "a likelihood that the suspect will escape if not swiftly apprehended"; and (6) the peaceful circumstances of the entry.

*Martinez-Gonzalez, supra*, 686 F.2d at 100 (quoting *Dorman, supra*, 572 F.2d at 424). This list is "illustrative, not exhaustive ...[;] the absence or presence of particular factors is not conclusive." *Ibid.* "In short, circumstances which, when viewed at the time of entry, would lead a reasonable person to believe that unless an entry

---

**3.** *See* page 486 & nn. 6–7 *infra.*

**4.** *See* note 1 *supra.*

and arrest are made immediately the suspect may escape, destroy essential evidence or continue the commission of an on-going crime, represent exigencies of the type justifying immediate police action on probable cause without first obtaining a warrant." *Campbell, supra,* 581 F.2d at 26. The exigent circumstances doctrine is meant to be broad enough "to accommodate legitimate law enforcement needs." *Steagald v. United States,* 451 U.S. 204, 222, 101 S.Ct. 1642, 1652, 68 L.Ed.2d 38 (1981).

The agents' ability to obtain prior judicial authorization should not be measured only by their ability to obtain a warrant by traditional means. The Federal Rules of Criminal Procedure now provide a mechanism for obtaining a warrant by telephone. *See* F.R.Cr.P. 41(c)(2). Rule 41(c)(2) is designed " 'to establish a procedure for the issuance of a search warrant when it is not reasonably practical for the person obtaining the warrant to present a written affidavit....' " *United States v. Iparraguirre,* 628 F.Supp. 831, 832 (E.D.N.Y.1986) (quoting Advisory Committee Note to 1977 Amendment to F.R.Cr.P. 41). The Advisory Committee noted,

> Federal law enforcement officers are not infrequently confronted with situations in which the circumstances are not sufficiently "exigent" to justify the serious step of conducting a warrantless search of private premises, but yet there exists a significant possibility that critical evidence would be lost in the time it would take to obtain a search warrant by traditional means.

Rule 41(c)(2) therefore makes telephonic warrants available " 'to encourage Federal law enforcement officers to seek search warrants in situations when they might otherwise conduct warrantless searches.' " *Iparraguirre, supra,* 628 F.Supp. at 833 (quoting Notes of Senate Committee on the Judiciary, S.Rep. No. 354, 95th Cong. (1977), *reprinted in* 1977 U.S.Code Cong. & Ad.News at 527. Therefore, although the Second Circuit does not appear to have expressly considered the issue, I believe that in the case at bar this Court must 'evaluate the availability of a telephonic warrant in determining the existence *vel*

*non* of exigent circumstances. *See, e.g., United States v. Cuaron,* 700 F.2d 582, 589 (10th Cir.1983); *United States v. McEachin,* 670 F.2d 1139, 1147 (D.C.Cir.1981); *United States v. Donaldson,* 606 F.Supp. 325, 332 (D.Conn.1985). Although the Advisory Committee Notes and Senate Report refer to "search" warrants, the Government concedes that Rule 41(c)(2) is available for arrest warrants as well. *See, e.g., United States v. Alvarez,* 810 F.2d 879 (9th Cir.1987); *United States v. Baker,* 520 F.Supp. 1080, 1083–84 (S.D.Iowa 1981). *Contra, United States v. Hultgren,* 713 F.2d 79, 85 n. 9 (5th Cir.1983).

The Government has introduced no evidence here regarding how long a telephone warrant would have taken to obtain. However, as Judge Eginton has explained, "more than a simple telephone call" is required.

> Each person whose testimony forms a basis for the application and each person requesting the warrant shall be placed under oath. The call shall be recorded by the magistrate by means of a voice recording device, if one is available, or by a stenographic or longhand verbatim record. The person requesting the warrant shall prepare a document known as the duplicate original warrant and shall read such document to the magistrate. The magistrate shall enter, verbatim, what is read to him on a document known as the original warrant. If he is satisfied that it is reasonable to dispense with the written affidavit and that grounds for the application exist, he shall issue the warrant by directing the person requesting it to sign the magistrate's name on the duplicate original warrant. The magistrate shall sign the original warrant. *See* Fed.R.Crim.P. 41(c)(2)(B), (C) and (D).

*Donaldson, supra,* 606 F.Supp. at 332. One court has estimated the process as "probably" taking 20 to 30 minutes. *Baker, supra,* 520 F.Supp. at 1084. Because the Government has introduced no evidence that the application would have taken longer, I will assume the agents could have obtained a warrant in 20 to 30 minutes.

*See McEachin, supra,* 670 F.2d at 1147 ("[b]ecause Government bears the burden of proving the existence of exigent circumstances, it must ordinarily introduce evidence on the availability of a telephonic warrant and on the time required to obtain one").

With these principles in mind, I turn to the facts at bar.

### A. Did Exigent Circumstances Exist At the Time of the Warrantless Arrest?

■ In my view, the Government has demonstrated the existence of "exigent circumstances" at the time of the warrantless entry and arrest.

The principal basis for my conclusion is the danger that certain highly probative evidence—the buy money—would be lost if the agents waited even twenty minutes more before effecting the arrest. This evidence might have been lost if Cattouse had been alerted to the agents' presence and had destroyed the evidence or, more likely, caused it to be removed and secreted.

True, the agents had no particularized reason to believe Cattouse had been alerted to their presence. *Compare, e.g., Cuaron, supra,* 700 F.2d at 589; *Martinez-Gonzalez, supra,* 686 F.2d at 101; *United States v. Vasquez,* 638 F.2d 507, 532 (2d Cir.1980), *cert. denied,* 454 U.S. 975, 102 S.Ct. 528, 70 L.Ed.2d 396 (1981) and *cert. denied sub nom. Mesa v. United States,* 450 U.S. 970, 101 S.Ct. 1490, 67 L.Ed.2d 620 (1981) and 454 U.S. 847, 102 S.Ct. 165, 70 L.Ed.2d 135 (1981). However, the agents testified that narcotics dealers often use "lookouts"; I am entitled to, and do, credit this testimony. *See, e.g., United States v. Ginsberg,* 758 F.2d 823, 830 (2d Cir.1985). The agents did not identify anyone in particular as a lookout, but I do not see how they can be expected to have done so.

Furthermore, the agents were all white in a mostly black neighborhood. The more carefully the agents surveilled the building

to assure that Cattouse himself did not leave, the more likely they were to attract attention. Even if Cattouse could not have destroyed the money, *but see United States v. Cognato,* 408 F.Supp. 1000, 1004 (D.Conn.1976) (Newman, J.) *aff'd mem.* 539 F.2d 703 (2d Cir.1976), *cert. denied* 430 U.S. 956, 97 S.Ct. 1603, 51 L.Ed.2d 806 (1977), any meaningful threat of Governmental involvement could have caused Cattouse to resort to the simple expedient of sending the buy money elsewhere with someone else. *See Campbell, supra,* 581 F.2d at 26. At this point, the traffic in and out of the building was substantial. However carefully the agents observed the building for signs of Cattouse, they could not be assured that one of those individuals they had not linked to the operations would not carry that evidence out of the building.

Moreover, the danger of removal of the buy money did not arise solely from the chance that Cattouse would be alerted to their presence. The agents testified that narcotics sellers often use "runners" to take the cash proceeds of sales to their suppliers. Since Cattouse had to go elsewhere to get the large bottle of PCP, there was a substantial likelihood that he had obtained the drug from a supplier who was awaiting the proceeds.[5] The agents need not have been certain evidence would be lost; it is sufficient if a "reasonable person [would] believe" "essential evidence" "may" be lost. *See Campbell, supra,* 581 F.2d at 26.

The danger that one of the unidentified persons entering and leaving the building was a runner secreting the buy money or bringing it to a supplier could only have been appreciably reduced by posting a watch on the third floor. To post a guard in what appears to have been a small hallway with only one or two apartments and a community bathroom would have posed a substantial threat of detection, making a hostile, or even violent resistance to the arrest more likely. *See, e.g., Campbell,*

---

**5.** I recognize that Cattouse might simply have been storing the narcotics elsewhere. However, that is simply an alternative explanation for Cattouse's behavior. His behavior nonetheless raises a substantial possibility that he was working with a supplier, and that the supplier expected the prompt return of Cattouse or a runner with the proceeds of the sale.

*supra,* 581 F.2d at 26; *Cognato, supra,* 408 F.Supp. at 1004. In my view, the agents were not required to take that risk.

I turn now to the factors listed in *Martinez-Gonzalez, supra.* These factors also weigh in favor of finding exigent circumstances.

The crime the agents were investigating is a most serious one: trafficking in an extremely dangerous narcotic. Although the agents had no particularized cause to believe Cattouse was armed, the Court of Appeals has emphasized that weapons are a common "tool of the trade" among "substantial dealers in narcotics." *Martinez-Gonzalez, supra,* 686 F.2d at 101. Cattouse's ready access to significant quantities of liquid PCP raises legitimate concerns for the possibility of violence. *See ibid.*

Furthermore, the probable cause showing in this case was particularly strong. An informant with a track record of reliability described the entire transaction in detail. He had successfully arranged an earlier buy at the same location at which Cattouse had appeared. Details of his story were confirmed by agents' observations—for example, agents had seen an individual matching Cattouse's description enter 164 West 133rd Street with a brown paper bag; shortly thereafter, Cattouse's return was confirmed by telephone call, and the informant soon emerged from the apartment building with the PCP in a brown paper bag. The probable cause showing to believe the "fat black guy" was involved in drug trafficking was formidable.

There was also a "strong reason to believe that the suspect [was] in the premises being entered." Since Cattouse was seen entering the building with the brown paper bag about 3:10 p.m., the informant had telephoned Cattouse's apartment before going back inside, the informant had stayed inside for 15–20 minutes, and the arrest was made around 4:00 p.m., the time between the completion of the sale and the arrest was at most 30 minutes, and probably less. Although the agents had failed once before to see Cattouse leave the building and although they were cautious in surveillance, the likelihood Cattouse had again left unobserved in that thirty minute period was small.

I cannot say there was a "likelihood" Cattouse would escape if not immediately apprehended; however, I do believe there was a substantial danger, increasing as the afternoon wore on, that Cattouse would be warned that something suspicious was afoot. As noted, there was testimony that substantial narcotics dealers use lookouts to warn of the possibility of police activity. Although they had not been detected during the afternoon, this all-white surveillance team justifiably feared looking conspicuous in this section of Harlem.[6] They had been cautious in surveillance all afternoon though they had to be more bold after Cattouse left the building undetected. The more the agents assured themselves they would see Cattouse leave, the greater the danger they would arouse suspicion. As that risk grew, so did the attending probability evidence would be removed and that the confrontation with Cattouse would be a hostile one. *See Martinez-Gonzalez, supra,* 686 F.2d at 101; *Campbell, supra,* 581 F.2d at 26; *Cognato, supra,* 408 F.Supp. at 1004.

Finally, the agents' knowledge of the building appears to have rested solely on the observations of the informant; their knowledge of the layout of the building was incomplete. They could not reasonably be certain that their coverage of the exits was sufficient to prevent Cattouse from leaving unobserved. *See United States v. Acevedo,* 627 F.2d 68, 71 (7th Cir.), *cert. denied* 449 U.S. 1021, 101 S.Ct. 587, 66 L.Ed.2d 482 (1980); *Donaldson, supra,* 606 F.Supp. at 332.

---

6. Defendant argues that to give weight to this factor would encourage the use of all-white teams in non-white neighborhoods. I find this argument unpersuasive. Surely government agents do not carry out their work with the single-minded objective of creating exigent circumstances. There are sufficient factors favoring the use of a well-disguised team of agents to ease the defendant's tactically expressed concern.

For these reasons, although I do not find there was a "likelihood" that Cattouse would have escaped—or even simply left unnoticed—in the 20–30 minutes it would have taken to secure a telephone warrant, I also believe the agents were faced with a growing danger of escape or hostile confrontation. They were entitled to consider this factor in choosing to effect Cattouse's arrest swiftly, without a warrant.

The final factor listed in *Martinez-Gonzalez* is "the peaceful circumstances of the entry." This factor gives rise to the only substantial factual dispute in the case. Agent Howell testified that after he knocked on the apartment door for less than a minute and announced his presence, someone opened the door part of the way from the inside. Tr. 26–27, 81–84, 96–97. Kim Morris, called by the defense, testified that agents broke the door open. Tr. 183–84.

I find it unnecessary to resolve this factual dispute, although I am inclined to credit the Government's version.[7] The other factors weigh sufficiently heavily in the Government's favor that even accepting the defendant's version the agents' warrantless entry and arrest were justified. The fact that the entry occurred during daylight hours further supports the reasonableness of the entry, whether or not it was a peaceful one. *Campbell, supra,* 581 F.2d at 26. And even if the agents did eventually force the door, they did attempt to gain peaceful entry first.[8] Having done so, and assuming there was no response from inside, they could not be expected in the circumstances presented here to have interrupted the process even 20–30 minutes to obtain a warrant, allowing Cattouse time to plan resistance to the entry.

I share defense counsel's concern that the exigent circumstances exception not be allowed to swallow the *Payton* rule. However, this was not a "routine felony arrest," *Payton, supra,* 445 U.S. at 576, 100 S.Ct. at 1374–75. In *Payton,* for example, both defendants committed crimes elsewhere, and police, knowing for some time who they were seeking and why, entered the defendants' homes without prior judicial approval.

Here, Cattouse was not simply seized in his "castle"; he had just dealt a substantial quantity of an extremely dangerous narcotic at a place where highly incriminating and equally disposable evidence remained to be found. For the reasons stated, I find the circumstances after the second buy sufficiently exigent to justify the warrantless entry and arrest.

**B.** *Did the Agents Create Exigent Circumstances By Failing to Seek a Warrant Earlier?*

Defendant contends that even if exigent circumstances existed at the time of the entry, the evidence should be suppressed because the agents should have obtained an arrest warrant earlier in the day.

 The exigent circumstances doctrine does not extend to law enforcement agents who "create their own exigencies." *United States v. Segura,* 663 F.2d 411, 415 (2d Cir.1981), *aff'd on other grounds,* 468

---

7. The Government's version is that after some knocking on the door, the door opened part way, but that Agent Howell saw no one standing there. Rather, whoever opened the door had stepped back and away from it.

This scenario does strike me as a bit unusual. However, Morris' testimony was far more problematic. She denied knowing that Cattouse was selling narcotics, even though she appears to have been present during most of the negotiations and she herself spoke with the informant for a number of minutes. She also denied that Cattouse had a brown paper bag when he returned, although the weight of the evidence is that he did. Although her testimony is not entirely implausible, I find the Government's version more likely to be accurate.

In reaching this conclusion, I note that I give little weight to Government Exhibit 1. Cattouse's negative response to the question on the Government's form, "Do you have any complaints about the way the agents treated you?" seems to me too easily explained by the circumstances in which it was given to have much probative value.

8. Morris testified that she never heard the agents knock and announce "police." However, she did recall hearing a commotion outside the door, and whether or not Agent Howell eventually resorted to force in entering, I find at least that the agent did knock and announce.

U.S. 796, 104 S.Ct. 3380, 82 L.Ed.2d 599 (1984). Thus, "when the emergency justification is advanced, ... it is appropriate to appraise the agents' conduct during the entire period after they had a right to obtain a warrant and not merely from the moment when they knocked on the door." *United States v. Rosselli*, 506 F.2d 627, 630 (7th Cir.1974) (Stevens, J.) (quoted in *ibid.*). However, narcotics agents are afforded some discretion to decide when to make an arrest, *United States v. Todisco*, 667 F.2d 255, 259 (2d Cir.1981), *cert. denied sub nom. Zambuto v. United States*, 455 U.S. 906, 102 S.Ct. 1250, 71 L.Ed.2d 444 (1982), and are not required to obtain a warrant "until such time as events had proceeded to a point where the agents could be reasonably certain that the evidence would ultimately support a conviction." *United States v. Montiell*, 526 F.2d 1008, 1010 n. 1 (2d Cir.1975) (citing *United States v. Morell*, 524 F.2d 550, 556 (2d Cir.1975)).

■ Although I find the question a close one, I do not believe the agents were required in this case to seek a warrant for Cattouse's arrest before the second buy was concluded, either after the initial buy in the morning or as events unfolded in the afternoon. That is so even if probable cause to arrest existed after the morning buy.

Although the informant does not appear to have actually seen whoever handed the one ounce bottle of PCP out of the apartment, he did meet Cattouse shortly thereafter in the hallway bathroom, and received Cattouse's assurance about the quality of the drug. And, if Cattouse had given the informant his telephone number, presumably so the informant could call him for a later transaction, that would be an additional factor.

But even if these facts would have supported an arrest warrant, I do not believe the agents could have been "reasonably certain" they had obtained proof beyond a reasonable doubt. Therefore, they were not required to obtain an arrest warrant at this stage. *See Montiell, supra,* 526 F.2d at 1010 n. 1.

As to the contention that the officers could have obtained a warrant during the course of the afternoon transaction, the afternoon's substantive offense was not complete til the sale was consummated. Further, the evidence of the afternoon transaction could not support an arrest for conspiracy, since at this point "Yogi" appears to have left the picture and the sale was transacted directly between Cattouse and a Government informant.

Finally, I do not believe the unfolding afternoon events required the agents to obtain a warrant based on the morning offense. True, evidence of Cattouse's willingness to enter into the afternoon transaction would be admissible, in the trial court's discretion, on the question of Cattouse's state of mind in the morning. *See, e.g., United States v. Carson,* 702 F.2d 351, 368 (2d Cir.1983); *United States v. Tramunti,* 513 F.2d 1087, 1116 (2d Cir.1975); F.R. Evid. 404(b). However, courts have been unreceptive to claims that law enforcement officers should have paused to weigh their evidence in the midst of an unfolding investigation to decide whether a warrant is required. *See United States v. Webster,* 750 F.2d 307, 326–28 (5th Cir.1984), *cert. denied,* 471 U.S. 1106, 105 S.Ct. 2340, 85 L.Ed.2d 855 (1985) and *cert. denied sub nom. Murphy v. United States,* 471 U.S. 1106, 105 S.Ct. 2341, 85 L.Ed.2d 856 (1985); *United States v. Palumbo,* 735 F.2d 1095, 1097 (8th Cir.), *cert. denied,* 469 U.S. 934, 105 S.Ct. 332, 83 L.Ed.2d 268 (1984); *See also* 2 W. LaFave, *Search and Seizure* § 6.1(f) at 600–02 (2d ed. 1987) (unlike when arrests are "planned," "when the occasion for arrest arises while the police are already out in the field investigating the prior or ongoing conduct which is the basis for the arrest, there should be a far greater reluctance to fault the police for not having an arrest warrant") (footnotes omitted). I cannot say they acted unreasonably here in failing to take stock during the afternoon operation of their evidence on the morning buy and evaluate the likelihood that subsequent similiar act evidence would be admitted under Rule 404(b).

This case presents close questions going to the responsibility of agents of govern-

ment to respect the security and privacy of the home. In *Rosselli*, then-Judge Stevens warned against allowing an exigent circumstances exception in a situation which "may reoccur repeatedly and might lend itself to too easy a by-pass of the constitutional requirement that probable cause should generally be assessed by a neutral and detached magistrate before the citizen's privacy is invaded." 506 F.2d at 630. It is troubling that the agents gave little thought to the need for a warrant here. *Compare Campbell, supra*, 581 F.2d at 27 (prudence of police officers considered in finding exigent circumstances).

But this is not a case where agents, having completed an investigation, and having planned elsewhere to effect an arrest and for no reason other than convenience, created exigent circumstances by going to the suspect's home without a warrant and announcing their presence. *Compare United States v. Morgan*, 743 F.2d 1158, 1162 (6th Cir.1984) (officers met at local coffee shop to "assess the situation" before making warrantless home arrest); *Segura, supra*, 663 F.2d 411 (2d Cir.1981), *aff'd on other grounds*, 468 U.S. 796, 104 S.Ct. 3380, 82 L.Ed.2d 599 (1984) (warrantless entry for security check of apartment held unjustifiable where agents, despite the absence of reason to believe occupants of apartment were aware of investigation or that there was any urgent need to enter apartment, created their own exigent circumstances by knocking at door); *United States v. Rosselli*, 506 F.2d 627 (7th Cir. 1974); *United States v. Serna*, 625 F.Supp. 548, 554–55 (S.D.N.Y.1985) (similiar facts to *Segura*). Given the state of the evidence on Cattouse's involvement in the earlier buy and the absence of probable cause to believe a crime was committed in the afternoon until the second sale was actually consummated, I find the officer's conduct in failing to obtain a warrant before the second buy was consummated reasonable. *See United States v. McEachin*, 670 F.2d 1139, 1145 (D.C.Cir.1981) (where decision not to obtain a warrant during an earlier stage of an investigation was not unreasonable, existence of exigent circumstances determined at the time of warrantless entry).

*Conclusion*

Defendant's motion is denied.

I will call the case for a pre-trial scheduling conference Monday, April 6, 1987 at 9:15 a.m., in Courtroom 307 of this Courthouse. I prospectively exclude, in the interests of justice, the time from today until the conference under the Speedy Trial Act in order that the parties may evaluate their positions in light of this Opinion. 18 U.S.C. § 3161(h)(8)(A).

The foregoing is SO ORDERED.