UNITED STATES of America

v.

Ronald DONALDSON.

Crim. No. B–84–45 (WWE).

United States District Court, D. Connecticut.

March 27, 1985.

Richard Reeve, for defendant.

Jeremiah Donovan, for government.

## RULING ON MOTION TO SUPPRESS STATEMENTS

EGINTON, District Judge.

The defendant Donaldson has been charged with one count of wilfully harboring and concealing a fugitive, Frank Spetrino III (hereinafter "Spetrino"), in a third floor apartment at 227 Grove Street, Bridgeport, Connecticut in violation of 18 U.S.C. § 472.

The defendant Donaldson has moved to suppress any and all statements made by him on the following grounds: (1) they were obtained in violation of his rights under *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); (2) they were obtained as the result of an unlawful search of defendant's apartment and an unlawful subsequent arrest; and (3) they were made involuntarily. The evidentiary hearing in this matter, conducted over the course of several days, focused primarily upon the second ground. For the reasons set forth below, the Motion to Suppress Statements is denied.

## I. FACTS

The Government has submitted Joint Proposed Findings of Fact which, with a few exceptions, are substantially agreed upon by the parties. Defendant has also

submitted additional Proposed Findings of Fact. Based upon these proposed findings and the testimony presented at the evidentiary hearing, the facts are described in detail below.

On June 28, 1984, Special Agent Paul Macrino of the United States Secret Service began an investigation concerning the passing of a twenty-dollar counterfeit note. The recipient of the note, a service station attendant, had copied down the driver's license plate number of the person passing the note. This license plate number was assigned to Frank Spetrino of 227 Grove Street, Bridgeport, the father of Spetrino.

On June 29, 1984, several agents of the Secret Service went to 227 Grove Street, where Spetrino lived with his father. The Spetrino residence was on the second floor of a three-story three-family building known as 225–229 Grove Street. The building has two front doors, one leading to the first floor residence and the other leading to a set of stairs for the second and third floor residences. Each residence has a back door to an interior stairway leading to a back exterior door on the first floor. Each apartment has a front and back porch accessible only through the apartment itself. There are alleyways on both sides of the building with chain-link fences four-feet high in both alleyways. Next door is another residence and, on the other side, a commercial building housing a laundromat and social club. The residence in question has a small back yard of approximately twenty feet by twenty feet surrounded by a chain-link fence about five feet high. However, the fence has a hole in it through which one can gain access to a parking area.

The agents were informed by Spetrino's father that Spetrino was not at home. However, agents observed Spetrino attempt to slip out of the back of the building. After being detained briefly, Spetrino agreed to be interviewed by the agents at the Bridgeport Police Department. During the interview, Spetrino admitted that he had passed the counterfeit bill. He stated that he had received the bill, along with others that he had used to purchase narcotics, from Thomas Palmieri of Naugatuck. After informing the agents that Palmieri planned to print up another large batch of counterfeit bills the next morning, Spetrino agreed to meet Agent Macrino the following morning. That night the agents maintained an all-night surveillance of Palmieri's residence.

On June 30, 1984, Spetrino went with Agent Macrino to the Bridgeport Police Department where Spetrino placed a telephone call to Thomas Palmieri. Agent Macrino then agreed to wait for Spetrino at the Bridgeport Police Department until Spetrino had returned from the methadone clinic. However, Spetrino did not return and Agent Macrino was unable to locate him. In the meantime, Thomas Palmieri peered directly into the Secret Service Surveillance van, thus ending the possibility of surreptitious surveillance.

On June 30, July 1, and July 2, Agent Macrino made several telephone calls to the Spetrino residence, but was informed by Spetrino's father that Spetrino was not at home and had not been seen. On July 2, 1984, Agent Macrino filed a complaint, and a warrant for Spetrino's arrest was issued at approximately 3:00 p.m. At approximately 4:00 p.m., surveillance was initiated at 227 Grove Street. Spetrino's father was observed letting Spetrino out of the car; Spetrino and his father then entered the building separately. Hoping to persuade Spetrino to meet him on the street, Agent Macrino telephoned the Spetrino residence. A female stated that neither Spetrino nor his father was at home. In a second telephone call a short while later, Agent Macrino was able to speak with Spetrino's father, who again stated that Spetrino was not at home and that he had not recently seen him.

As Special Agents Macrino and Rasor approached the Grove Street residence, Agent Macrino noticed a man on the third-floor porch scanning the neighborhood. Three additional agents were left to guard the outside of the house; two were positioned in the front of the house and one in

the back. Agents Macrino and Rasor went to Spetrino's second floor apartment. Spetrino's father stated that his son was not home and that he had not seen him recently. He then agreed to let Agents Macrino and Rasor look around the apartment for Spetrino. Spetrino could not be located.

Leaving Agent Rasor with Spetrino's father, Agent Macrino went up to the third floor apartment and knocked on the door. Defendant Donaldson, the same man who had been scanning the neighborhood from the third-floor porch, answered. Agent Macrino identified himself and told defendant Donaldson that he had a warrant for Spetrino's arrest. Defendant Donaldson stated that Spetrino was not in the apartment, and he refused to allow Agent Macrino to enter without a search warrant. Agent Macrino, along with Agent Rasor who had joined him outside the third-floor doorway, explained that if he were hiding Spetrino within, he would be committing the crime of harboring a fugitive. Defendant Donaldson continued to maintain that Spetrino was not in the apartment and that the agents could not enter without a search warrant.

After signaling to the agent in the back of the Spetrino residence to move in closer, Agent Rasor went to the second-floor apartment to see Spetrino's father, who admitted finally that Spetrino was hiding upstairs. Agent Rasor returned to the third floor and told Donaldson that he knew Spetrino was in the apartment. Although the agents shouted in to Spetrino that he should surrender, defendant Donaldson refused to permit the agents to enter. Agents Rasor and Macrino could hear the voices of a female and small children inside the apartment. They pushed past defendant Donaldson and a minor shoving match occured at the door.

Although Agent Rasor ordered defendant Donaldson to remain still, Donaldson moved toward a bedroom. Agent Rasor drew his gun and commanded Donaldson to stop. By this time, Donaldson was inside the bedroom. At Agent Rasor's command, he sat in a chair. While Agent Rasor stayed in the bedroom facing defendant Donaldson, Agent Macrino searched the remainder of the apartment. After a few minutes, Donaldson's girlfriend, June Stella Pighinni, came into the bedroom and lay down on the bed, which had been placed at a forty-five degree angle in a corner of the room. Agent Gardner, who had been one of the surveillance agents, joined Agent Macrino in the search. At Agent Rasor's instruction to look behind the bed, Agent Gardner ordered Pighinni off the bed. He looked in the triangular space made by the corner of the wall behind the bed, drew his firearm, and ordered the person hiding in that space to come out. Spetrino appeared from behind the bed. Agent Rasor's back had been to Spetrino throughout the time that he was in the room.

Spetrino and defendant Donaldson were placed under arrest and brought to the Westport barracks of the State Police Department for processing. Although the parties dispute the exact time of arrival, it was approximately 5:00—5:30 p.m. Donaldson was interrogated by Special Agents Healy and Flaherty in a small room. Agent Healy read Donaldson the standard *Miranda* warnings and Donaldson read silently along. Defendant Donaldson indicated that he understood his rights and signed the acknowledgment. By this time, it was 6:15 p.m. Agent Healy then read the "waiver of rights" section of Secret Service Form 1737 (Gov't Ex. 5). Defendant Donaldson read silently along with the agent and then stated that he was willing to waive his rights by signing the waiver.

Defendant Donaldson told Agent Healy that he had returned home from work at about 3:30 that afternoon. At about 5:00 p.m., Spetrino knocked on his door and told Donaldson that he was being watched by someone. Donaldson asked Spetrino if they were the same persons who had arrested Spetrino on June 29, 1984. Spetrino said he thought so. Spetrino asked Donaldson if he could stay in the third-floor apartment because the agents could not enter it without a search warrant. Spetrino offered defendant Donaldson $20.00 so

that Donaldson could take his girlfriend and her children to a movie. Donaldson agreed as long as he would not be present; he did not want to get into any trouble. However, before Donaldson, his girlfriend and the children could leave, the Secret Service agents arrived at the door. It is not clear whether Donaldson actually received the $20.00 from Spetrino. Defendant Donaldson admitted that he was wrong to have protected Spetrino and lied to the agents.

Agent Healy asked Donaldson if he would be willing to make a written statement and defendant Donaldson agreed. Agent Healy used a form which contained another set of *Miranda* warnings and a second waiver, which Donaldson read and executed. Donaldson then repeated his statement as Agent Healy wrote it down. After reading through the statement and agreeing as to its accuracy, defendant Donaldson initialed the statement at various places, swore to its truth, and executed the statement. He was photographed, fingerprinted and released after being in custody for approximately an hour-and-a-half.

## II. DISCUSSION

Defendant Donaldson argues that his statements should be suppressed because the search of his apartment and the subsequent arrest were unlawful and his *Miranda* rights were violated. He also claims that he made the statements involuntarily.

## A. THE SEARCH

Defendant contends that the search of his apartment was illegal, pursuant to *Steagald v. United States*, 451 U.S. 204, 101 S.Ct. 1642, 68 L.Ed.2d 38 (1981), because it was conducted without a warrant and in the absence of exigent circumstances. The Government argues that the warrantless search was proper, because exigent circumstances existed. Alternatively, the Government maintains that the search was proper under *Payton v. New York*, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980) and that *Steagald, supra* is inappli-

cable. Its third argument is that the search was proper as incident to defendant Donaldson's arrest. Each of these arguments will be separately considered. Because defendant Donaldson's standing to contest the search was the subject of some discussion at the evidentiary hearing, it will be discussed briefly below.

*Standing*

■ In order to have standing to contest a search and seizure, an individual must have a legitimate expectation of privacy in the premises searched or the property seized. *Rakas v. Illinois*, 439 U.S. 128, 148–49, 99 S.Ct. 421, 432–33, 58 L.Ed.2d 387 (1978). It has been established that on July 2, 1984 and for several months prior thereto, defendant Donaldson resided at 229 Grove Street in Bridgeport, Connecticut with June Stella Pighinni and her three children. His clothes and personal possessions were there and he shared financial and personal responsibility for maintenance of this apartment as his home. The telephone in the apartment was listed in the name of Ronald Donaldson. (Tr., 10/31/84 at 153–55).

■ There is no question that 229 Grove Street, a third-floor apartment, was defendant Donaldson's home at the time of the search in question. The Supreme Court in *Rakas, supra* emphasized that the petitioner in *Jones v. United States*, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960) had a legitimate expectation of privacy in the premises searched. Although it was a friend's apartment, Jones had permission to use it, he entered with a key, and kept some possessions there. Therefore, there is no question that defendant Donaldson had a legitimate expectation of privacy in the premises known as 229 Grove Street and has standing to challenge the search of the premises.

*Applicability of Steagald*

Defendant contends that *Steagald v. United States*, 451 U.S. 204, 101 S.Ct. 1642, 68 L.Ed.2d 38 (1981) is applicable to this matter. The Government, however, has

**330**

made an alternative argument that *Payton v. New York*, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980) applies because defendant Donaldson's apartment was Spetrino's short-term residence.

In *Payton, supra*, the Supreme Court held that an arrest warrant carries only the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within. Two years later in *Steagald, supra*, the Court stated that the home of a third party may not be searched for the subject of an arrest warrant absent a search warrant or exigent circumstances.

■ The Government argues that the search of the third-floor apartment known as 229 Grove Street was proper under *Payton* because Spetrino became a temporary resident of the apartment when he offered defendant Donaldson $20.00 to hide there from the Secret Service agents. In order for *Payton* to be applicable, Spetrino's expectation in the third-floor apartment must have been identical to that which he would have in his own home. For example, a motel room may be temporarily equivalent to a home. *United States v. Bulman*, 667 F.2d 1374, 1383–1384 (11th Cir.1982). This court finds that defendant Donaldson's third-floor apartment was not temporarily equivalent to Spetrino's home. Even if Spetrino paid Donaldson the $20.00, a fact which is in dispute and on which no evidence was taken, Spetrino was not "renting" the apartment for the purpose of using it as his home. He did not intend to reside there for a short time nor did he intend to stay there even one night. Rather, he merely intended to stay there until the Secret Service agents left. Therefore, *Payton* is not applicable.

Accordingly, the warrantless search of defendant Donaldson's third-floor apartment was valid only if exigent circumstances were present. *Steagald, supra*, 451 U.S. at 205–06, 101 S.Ct. at 1644–45.

*Exigent Circumstances*

In *Payton, supra*, 445 U.S. at 583, 100 S.Ct. at 1378, the Supreme Court refused to consider the type of emergency or danger-

ous circumstances that would justify a warrantless entry into a home for the purpose of either an arrest or a search. In *Steagald, supra*, 451 U.S. at 221, 101 S.Ct. at 1652, however, the Court cited the "hot pursuit" of a fugitive as an example of an exigent circumstance. Last year the Court expanded upon its description of exigent circumstances. In *Welsh v. Wisconsin*, —— U.S. ——, 104 S.Ct. 2091, 80 L.Ed.2d 732 (1984), the Supreme Court held that a warrantless, nighttime entry into a home to arrest an individual for driving while under the influence was prohibited by the Fourth Amendment. It designated the gravity of the underlying offense as an important factor to be considered in determining whether an exigency exists, and stated that the exigent circumstances exception in the context of a home entry should "rarely be sanctioned when there is probable cause to believe that only a minor offense ... has been committed." 104 S.Ct. at 2099. The Court cited three possible exigencies—hot pursuit, threat to public safety, and destruction of evidence—and concluded that none existed in that case.

■ The Court of Appeals for the Second Circuit has expressly stated some of the factors that should be considered in determining the existence of exigent circumstances.

> These include (1) the gravity or violent nature of the offense with which the suspect is to be charged; (2) whether the suspect "is reasonably believed to be armed"; (3) "a clear showing of probable cause ... to believe that the suspect committed the crime"; (4) "strong reason to believe that the suspect is in the premises being entered"; (5) "a likelihood that the suspect will escape if not swiftly apprehended"; and (6) the peaceful circumstances of the entry.

*United States v. Reed*, 572 F.2d 412, 424 (2d Cir.1978), quoting *Dorman v. United States*, 140 U.S.App.D.C. 313, 320, 435 F.2d 385, 392–93 (1970). This list is merely illustrative and not exclusive; other factors may be relevant. Furthermore, the pres-

ence or absence of particular factors is not conclusive. The determination is based upon whether, in light of all the factors of the case, there was an urgent need justifying the warrantless entry. *United States v. Martinez-Gonzalez*, 686 F.2d 93, 100 (2d Cir.1982). The Government has the burden of showing that the agents had an urgent need to enter the premises without a warrant. *United States v. Reed, supra*, 572 F.2d at 424.

In considering the first factor, the gravity of the offense, the defendant argues that the passing of a $20.00 counterfeit bill should be considered a minor offense. This court disagrees. The passing of a counterfeit note is governed by 18 U.S.C. § 472, which provides that anyone who violates this provision shall be fined not more than $5,000 or imprisoned not more than fifteen years, or both. A maximum penalty of fifteen years imprisonment is the same as that authorized for a first conviction of narcotics distribution (21 U.S.C. § 841(a)), an offense which the Second Circuit has described as "a most serious offense ..." *Martinez-Gonzalez, supra*, 686 F.2d at 100–01. A violation of 18 U.S.C. § 472 is clearly more serious than the driving under the influence offense in *Welsh v. Wisconsin, supra*. The Court based its decision in *Welsh* largely upon the fact that the offense was merely a civil violation allowing only a money forfeiture of not more than $300.00 for the first offense.

The second factor is whether the suspect was reasonably believed to be armed. This factor obviously reflects a concern for public safety. Because the Secret Service Agents had no specific facts from which to infer that Spetrino was armed, this court cannot conclude that a reasonable belief existed. However, it is noted that the agents were aware on July 2, 1984 that Spetrino had numerous arrests and convictions for burglaries and narcotics offenses; that he was a heroin addict who was receiving methadone from a clinic; and that he used counterfeit money to purchase narcotics. Therefore, the agents might properly have had some concern about Spetrino be-

ing armed. However, it was not sufficient to constitute a reasonable belief.

As to the third factor, there is no question that the agents had probable cause to believe that Spetrino had committed the crime. On June 29, 1984, Spetrino confessed to Agent Macrino that he had indeed passed the counterfeit note. In addition, his father's vehicle had been identified as the one used by the perpetrator.

The agents also had strong reason to believe Spetrino was in the premises. They had seen him enter the building and had not seen him leave. They had observed defendant Donaldson scanning the neighborhood from the third-floor front porch. In addition, the Spetrino residence was searched and Spetrino was not located. Finally, Spetrino's father told the agents that his son was hiding upstairs.

The fifth factor is the one most in dispute: the likelihood of Spetrino's escape if not swiftly apprehended. The Government argues that Spetrino was a defendant intent upon escape. He tried to slip away from the Spetrino residence on June 29; he evaded Agent Macrino and could not be found on June 30 and July 1; and he was hiding when the agents sought to arrest him on July 2. Furthermore, after the commencement of prosecution, Spetrino failed to appear for a hearing. He was arrested in a motel room with an escaped prisoner on October 25, 1984. In addition, members of his family assisted him in his attempts to avoid capture by lying about his whereabouts to the agents.

The Government also argues that Spetrino had several escape routes available to him. There were three agents outside; two in the front of the building and one in the back. The Government contends that Spetrino could have slipped out one of the windows of the first-floor apartment to an alleyway on either side of the building and slipped into a window in the residence or social club next door. He could have hidden in the Spetrino residence in the hope that the agents would not search there again. He could have shinnied down the porch pillars and made a break across ad-

joining lots and yards, hoping to lose the agents. He could have rushed into any of the neighboring residences or commercial buildings. The Government argues that exigent circumstances existed because there were an insufficient number of surveillance agents to watch all exists. *United States v. Johnson,* 660 F.2d 749 (9th Cir.1981).

The defendant, however, contends that there was not a sufficient likelihood of escape. Although surveillance can never absolutely guarantee the impossibility of an escape, all three agents who testified expressed their confidence that the building was secured. Spetrino's likelihood of escape is a close question. However, this court finds that there was a serious risk that Spetrino would escape during the time necessary to secure a search warrant. Based upon their past experience with Spetrino, the agents had reason to believe that he would attempt to escape by any means possible. In addition, a suspect who realizes he is in danger of immediate apprehension is likely to attempt to escape or engage in armed resistance. *United States v. Flickinger,* 573 F.2d 1349, 1355 (9th Cir. 1978). Although law enforcement officials should take precautionary measures to guard against escape, the agents ability to do so was limited in this case. They had been to the Spetrino residence previously; however, their knowledge of the layout of the building was incomplete. They could not reasonably be certain that their coverage of the exits was sufficient to prevent Spetrino's escape. *United States v. Acevedo,* 627 F.2d 68, 71 (7th Cir.1980).

The defendant argues that the agents had sufficient time to obtain a search warrant, because the Bridgeport federal courthouse was 0.8 of a mile from 229 Grove Street and there were two federal district judges and one magistrate available until approximately 6:00 p.m. that day. Although it would have taken only approximately ten minutes to travel to and from the courthouse, the time necessary to prepare the required affidavit or affidavits and to obtain the warrant would have

posed a serious risk of Spetrino's escape. *See* Fed.R.Crim.P. 41(c).

Defendant also contends that the agents could have obtained a search warrant by telephone in accordance with Fed.R.Crim.P. 41(c)(2). Pursuant to this provision, federal magistrates are authorized to issue warrants based on telephone communications. However, more than a simple telephone call is required to obtain a warrant based upon oral testimony. *See United States v. Berick,* 710 F.2d 1035 (5th Cir.1983). Each person whose testimony forms a basis for the application and each person requesting the warrant shall be placed under oath. The call shall be recorded by the magistrate by means of a voice recording device, if one is available, or by a stenographic or longhand verbatim record. The person requesting the warrant shall prepare a document known as the duplicate original warrant and shall read such document to the magistrate. The magistrate shall enter, verbatim, what is read to him on a document known as the original warrant. If he is satisfied that it is reasonable to dispense with the written affidavit and that grounds for the application exist, he shall issue the warrant by directing the person requesting it to sign the magistrate's name on the duplicate original warrant. The magistrate shall sign the original warrant. *See* Fed.R.Crim.P. 41(c)(2)(B), (C) and (D). Although it is a close question, the court concludes that the circumstances of this case justified immediate action such that there was insufficient time even to obtain a telephone warrant.

The sixth factor for the court to consider in determining the exigency of the circumstances is the nature of the entry. The agents knocked on defendant Donaldson's door and showed their creditentials. They made repeated requests to search the premises, but were denied. They even shouted in to Spetrino, hoping to persuade him to surrender. It was only after the agents were reasonably certain that Spetrino was upstairs that they pushed past defendant Donaldson. The court finds that this entry was reasonable. *See United*

*States v. Acevedo,* 627 F.2d 68, 71 (7th Cir.1980).

■ The court concludes that the Government has met its burden of showing the existence of exigent circumstances sufficient to justify the warrantless entry and search. The offense with which Spetrino was charged was one of a serious nature. There was probable cause to believe he had committed the crime and strong reason to believe he was in the premises. Moreover, there was a serious risk that Spetrino would escape during the time necessary to obtain a search warrant, even if it were obtained by telephone. In addition, the nature of the agents' entry was as peaceful as possible under the circumstances. Therefore, the Government's actions were justified by the exigency of the circumstances.

*Search Incident to Arrest*

One of the Government's alternative arguments is that the search was justified as being incident to defendant Donaldson's arrest. Because this court has concluded that the search was justified on the basis of exigent circumstances, it is not necessary to consider this alternative argument. In any event, the argument is without merit.

■ Because an incident search may not precede an arrest and serve as part of its justification, *Sibron v. New York,* 392 U.S. 40, 63, 88 S.Ct. 1889, 1902, 20 L.Ed.2d 917 (1968), the Government contends that defendant Donaldson was arrested before the search took place. A suspect is arrested when he is seized and his freedom of movement is curtailed. *Id.* at 67, 88 S.Ct. at 1904. Although Donaldson's freedom of movement was restrained before the search occurred, it was after the agents entered the third-floor apartment. Therefore, the entry cannot be justified as incident to the arrest.

## B. STATEMENTS

Defendant has moved to suppress statements made by him not only on the basis of the search, but also on the grounds that they were obtained in violation of his *Miranda* rights and were made involuntarily. However, defendant has not briefed these issues and no evidence was presented at the hearing to substantiate them. The facts show that defendant was read his *Miranda* warnings before he made any statements. There is absolutely no evidence that such statements were made under coercion or in the absence of free will.

In conclusion, the court finds that defendant's statements should not be suppressed. They were not made involuntarily or in violation of his *Miranda* rights. In addition, they were not obtained as the result of an unlawful search, because there were exigent circumstances justifying the warrantless search. Therefore, defendant's Motion to Suppress Statements is DENIED.

SO ORDERED.