UNITED STATES of America

v.

Noel REMY, Edward Garcia, Liliana Vasquez, and Dora Gonzalez, Defendants.

No. 86 CR. 670 (DNE).

United States District Court, S.D. New York.

April 17, 1987.

Rudolph W. Giuliani, U.S. Atty., S.D. N.Y., for the U.S.; Michael Kellogg, Adam Hoffinger, Asst. U.S. Attys., of counsel.

David Goldstein, Bronx, N.Y., for defendant Noel Remy.

Michael M. Freeman, William J. Stampur, New York City, for defendant Edward Garcia.

Franklin B. Mandel, New York City, for defendant Liliana Vasquez.

Justin Levine, Bronx, N.Y., for defendant Dora Gonzalez.

## MEMORANDUM AND ORDER

EDELSTEIN, District Judge:

The defendants, Noel Remy, Edward Garcia, Liliana Vasquez and Dora Gonzalez, are charged with possessing with intent to distribute approximately two kilograms of cocaine in violation of 21 U.S.C. Sections 812, 841(a)(1), 841(b)(1)(B) and 18 U.S.C. Section 2. The defendants are also charged with conspiring to distribute cocaine and possess cocaine with intent to distribute it in violation of 21 U.S.C. Section 846. Defendant Noel Remy ("Remy") has moved to suppress physical evidence seized in alleged violation of his Fourth Amendment rights. Defendant Dora Gonzalez ("Ms. Gonzalez") joins in Remy's motion. Defendant Liliana Vasquez ("Ms. Vasquez") has also moved for a bill of particulars pursuant to Rule 7(f) of the Federal Rules of Criminal Procedure. Evidentiary hearings were held on December 23, 1986 and January 22, 1987. The motions are denied.

With regard to the motion to suppress evidence, this memorandum memorializes the motion's denial in open court on December 23, 1986.

## BACKGROUND

On July 19, 1986, an allegedly reliable confidential informant ("CI") of the DEA, accompanied by an unidentified friend, met with Remy and Edward Garcia ("Garcia") at 181st Street and Fort Washington Avenue, Bronx, New York to negotiate a purchase of cocaine. The CI was in the passenger seat of a car with his friend when Remy and Garcia arrived in a jeep. Garcia came over to the CI, introduced himself, and told the CI to take the driver's seat and follow the jeep. Garcia told the CI's friend to ride in the jeep with Remy while Garcia rode with the CI. The four men went to 193rd Street and Fort Washington Avenue where the CI negotiated with Remy to buy two kilograms of cocaine for $25,000 each. After that, the four drove to Remy's apartment at 3820 Bailey Avenue, Apt. 1E, Bronx, New York, where Remy gave the CI a sample of cocaine. While inside the apartment, the CI observed a large Doberman pinscher which he was told was an attack dog.

Immediately following this meeting, the CI met with Brian Averi ("Agent Averi"), a Special Agent for the DEA, who had witnessed the initial meeting at 181st Street and Fort Washington Avenue. The CI then gave Agent Averi the sample that had been provided by Remy. A field test of the sample proved positive for the presence of cocaine.

Five days later, on July 24, 1986, at approximately 6:25 P.M., the CI received a telephone call from Remy. The call was placed to the DEA's undercover telephone and was taped. In the conversation, Remy told the CI that the deal for the two kilograms of cocaine would take place later that evening. The CI was informed that Remy would first have to go to Queens to meet an unidentified woman to pick up the two kilograms of cocaine. Remy would

then return to his own apartment at 3820 Bailey Avenue, Apt. 1E, in the Bronx and meet the CI at approximately 8:00 or 8:30 P.M.

After he listened to the tape of the conversation, Agent Averi contacted an Assistant United States Attorney, at approximately 6:45 P.M. on the evening of July 24, 1986. Agent Averi described the events and what he expected would occur later that evening, that the CI would be invited inside Remy's apartment, see the cocaine and obtain a sample, tell Remy that the $50,000 was waiting outside with his partner in a car and then go out to the car where the sample would be tested. Once the sample was found to be cocaine, the CI would return with an undercover agent to the apartment and the arrest would be made. At no time in this plan would any of the agents actually have $50,000 with which to buy the cocaine.

The Assistant United States Attorney advised Averi that he would not need a warrant as long as no search was made. At no time prior to the arrest of the defendants did Agent Averi or any other officer involved in the case attempt to obtain a written or a telephonic warrant.[1] Based on this opinion, Agent Averi immediately instructed the surveillance agents who would participate in the arrest, all of whom were with Agent Averi at his office at 26 Federal Plaza, that when they entered Remy's apartment later that evening, they could only seize contraband found in plain sight and that they could not search the apartment because they would not have a warrant.

At approximately 8:15 P.M. on July 24, 1986, the surveillance team, which consisted of Agent Averi, Agent Hanna, Agent Pasquarello, Agent Rooney, Undercover Agent Denehy and the CI all arrived outside 3820 Bailey Avenue. Agent Averi,

acting in an undercover capacity, proceeded to the building at 3280 Bailey Avenue. There, along with the CI, Agent Averi rang the buzzer for apartment 1E, but no one answered. The CI returned to an unmarked vehicle with Undercover Agent Denehy and they both proceeded to 238th Street and Broadway where, as previously arranged, they placed several beeps from a pay phone to Remy's two beeper numbers. Approximately seven minutes after the CI placed the beeps, Remy drove up in a dark colored Buick with an unidentified female, who was later identified as Ms. Liliana Vasquez. The Buick pulled up across the street from the pay phone from which the CI had been signaling Remy. Without acknowledging the CI, Remy proceeded into a bar across the street from that pay phone and returned the beeps to the pay phone. Remy and the CI then had a phone conversation at approximately 9:00 P.M. in which Remy instructed the confidential informant to go to 238th Street and Broadway and wait there for five minutes before proceeding to the apartment. At this point, Agent Denehy returned to his undercover vehicle and radioed to the other surveillance agents the description of the dark colored Buick and that Remy was inside the car with a female later identified as Ms. Vasquez.

Shortly after having left 238th Street and Broadway the dark colored Buick pulled up in front of 3820 Bailey Avenue and Remy and Ms. Vasquez entered the building. Ms. Vasquez was carrying a maroon and gray gym bag. As had been arranged earlier, Agent Averi met the CI at the entrance of 3820 Bailey Avenue. As the two men walked toward the electronic doors of the building both observed a female later identified as Ms. Dora Gonzalez tapping on a large window to their right.

---

**1.** Although there was no effort to secure a telephonic warrant, this court questions whether such a warrant could have been obtained before the scheduled meeting with Remy. Agent Averi was first in a position to request a warrant at approximately 6:45 P.M. At the earliest, the meeting with Remy was scheduled for 8:00 P.M. This allowed precious little time for the agents to secure a warrant and travel from lower Man-

hattan to the Bronx, the presumed site of the sale. Furthermore, at the time of Remy's call to the CI, it was not entirely clear where the sale was to actually take place. Given the constraints of time and uncertainty regarding the location of the contraband, it seems unlikely that the agents could have obtained a warrant prior to the planned meeting with Remy.

The window turned out to be part of Remy's ground floor apartment, apartment 1E. Upon Ms. Gonzalez' inquiry, the CI confirmed that he was coming to see Remy. Ms. Gonzalez introduced herself as Remy's wife and let the men inside the electronic door. After entering the building, Agent Averi acted as if he was a tenant of the building while Ms. Gonzalez led the CI into apartment 1E. Agent Averi went up into a stairwell to conduct further surveillance. Inside the apartment, the CI encountered Remy and Ms. Vasquez. The CI was shown four one-half kilogram packages of cocaine by Remy. At approximately 9:16 to 9:20 P.M. the CI took a sample of the cocaine and told Remy that the CI's partner had the $50,000 out in the car. The CI then went outside and removed his shirt, the prearranged signal to Agent Averi, who then radioed to the undercover vehicle that the cocaine was indeed inside the apartment. The CI proceeded to the undercover vehicle with the sample of cocaine. Several minutes later, Agent Denehy radioed from that vehicle to all the agents that the CI had observed three people, a dog, and four rectangular oblong plastic packages of cocaine, approximately one-half kilogram each, inside the apartment. While the CI was outside, Agent Averi observed a few people enter the building, including Garcia, who Agent Averi heard enter an apartment on the first floor. Agent Averi radioed the backup team that there were now possibly four people inside the apartment.

At some time shortly after 9:25 P.M., Agent Averi let the other agents inside the building and then propped open the electronic doors with a telephone book. The CI then returned to the building with Undercover Agent Denehy. The CI knocked on Remy's door and Remy opened the door and allowed the two men to begin to proceed inside the apartment. At this time, Agent Averi and the rest of the surveillance agents stepped out from the lobby wearing their badges around their necks and identified themselves as police officers. Remy tried to close the door on the CI and Agent Denehy but the surveillance agents slammed the door back, pinning Remy againt the wall.

Agent Averi placed Remy under arrest while the other surveillance agents proceeded throughout the apartment on a security sweep and placed Ms. Gonzalez, Ms. Vasquez and Garcia under arrest. Ms. Gonzalez was arrested in the kitchen and Ms. Vasquez and Garcia were arrested in the living room. The sweep took approximately five minutes. Following the sweep, Agent Averi instructed the squad that because they did not have a search warrant, only items or contraband or weapons found in plain view could be seized or removed from Remy's apartment at that time. These instructions were given from the living room of the two bedroom apartment and though not all the agents were in that room at the time, Agent Averi attempted to direct his voice so that all could hear the instruction.

In the living room, Agent Averi positioned himself at the dining room table to receive the items brought to him by the agents as a result of the sweep. As each item was brought to him, Agent Averi wrote down the location that each item was removed from, the initials of the agent who found the item and placed a piece of masking tape on each item with his own initials and the date. In a number of unspecified instances, after listening to an agent's report where the items had been found in the apartment, Agent Averi determined that various objects had been sufficiently concealed so that he could not accept them without a search warrant. In those instances, Agent Averi rejected the items brought to him by the agents. The items which Agent Averi accepted from the agents on the basis that they were found in plain view during the course of the security sweep included a .380 handgun, balance beam scale, 10 boxes of plastic baggies and ziplock sandwich bags, narcotics records, lightning zapper, cocaine handbook, $1,420 in cash, rent arrears notice, digital scale, maroon and gray gym bag, Pampers box containing approximately two kilograms of cocaine, and approximately 44 grams of marijuana. Further, Agent Averi seized

telephone pagers from the persons of both Remy and Garcia.

At the hearing held on December 23, 1986, Agent Averi testified to the location of the items seized by the agents while inside the apartment. Though Agent Averi did not witness the seizure of any of the items, he testified that he thoroughly questioned each agent regarding the location of those items and any relevant details as each item was brought to him at the dining table. In the living room, the agents found the Pampers box containing four one-half kilogram packages of cocaine, $1,420 in cash, a rent arrears notice, a box of plastic baggies, and a maroon and gray gym bag which was allegedly used to carry the cocaine into the apartment.

The Pampers box was found on the carpet of the living room of the apartment approximately three inches from a couch which adjoins the dining room. According to Agent Averi, the agent who seized the box told him that when it was found, the flap on the top of the box was completely open and each of the four rectangular packages was standing upright and was visible by looking at the Pampers box. The agents also found $1,420 in United States currency in Ms. Gonzalez' pocketbook which was laying open on the living room floor. The money was found with a white rent arrears notice wrapped around it but with the ends of the bills exposed. Also in the living room, the agents found boxes of plastic baggies on a small glass television stand and the maroon and gray gym bag on the couch.

In the master bedroom of the two-bedroom apartment, the agents found a .380 semiautomatic handgun, an Ohaus digital scale, a lightning zapper and a reference book on cocaine on top of a four foot tall armoire which was located against a wall of the bedroom approximately ten feet from the doorway. In the master bedroom the agents also found a calendar book on top of a small nightstand in the master bedroom. When found, the book was closed and the cover of the book itself contained no writings or markings.

In the kitchen, a balance beam scale was seized by an agent from an open kitchen cabinet. Boxes of Ziploc bags and plastic baggies were also found and seized from an open kitchen counter. In the smaller bedroom of the apartment, on top of a small dresser or nightstand, an agent found more boxes of plastic baggies which he seized.

The agents also seized 44 grams of marijuana. At the hearing held on December 23, 1986, no testimony regarding the specific location of the 44 grams of marijuana was presented. Agent Averi did testify, however, that all the items seized were found in plain view. At a supplemental hearing held on January 22, 1987, Agent Averi testified that Agent Hanna found the marijuana in plain view atop the kitchen table.

## MOTION TO SUPPRESS

### A) Exigent Circumstances

■ The defendant Remy has moved to suppress the evidence seized from his apartment on the ground that such evidence was seized in contravention of his Fourth Amendment rights. This court must begin its analysis with the proposition that a warrantless entry into a home in order to make a routine felony arrest on probable cause is not justified in the absence of exigent circumstances. *Payton v. New York*, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). In the instant case, however, the government claims that the warrantless entry into apartment 1E at 3820 Bailey Avenue was supported by exigent circumstances.

In *United States v. Martinez-Gonzalez*, 686 F.2d 93 (1982), the Second Circuit held that the determination of whether exigent circumstances exist must turn upon "whether in light of all the facts of the particular case there was an 'urgent need' that 'justif[ies]' a warrantless entry." *Id.* at 100, (quoting *Dorman v. United States*, 435 F.2d 385, 391 (D.C.Cir.1970). To determine whether such "urgent need" exists, the Second Circuit has provided a non-exclusive list of six factors to be considered: 1) the gravity or violent nature of the offense to be charged, 2) whether the sus-

pects are reasonably believed to be armed, 3) a clear showing of probable cause to believe the suspects committed the offense, 4) strong reason to believe that the suspects are in the premises to be entered, 5) a likelihood that the suspects will escape if not swiftly apprehended, and 6) the peaceful circumstances of the entry. *United States v. Reed,* 572 F.2d 412 (2d Cir.), *cert. denied sub nom. Goldsmith v. United States,* 439 U.S. 913, 99 S.Ct. 283, 58 L.Ed.2d 259 (1978). Applying these six factors, this court concludes that exigent circumstances justified the warrantless entry into Remy's apartment.

*Factors One and Two:*

Gravity or Violent Nature of the Offense and the Presence of Weapons

The offense charged in the instant case involves trafficking in cocaine. This clearly is an extremely serious offense and one that often involves violence. *United States v. Martinez-Gonzalez,* 686 F.2d 93, 100–01 (2d Cir.1982); *United States v. Vasquez,* 634 F.2d 41, 43 (2d Cir.1980). It is also clear that firearms are frequently associated with dealers in substantial amounts of cocaine. *United States v. Figueroa,* 750 F.2d 232, 238 (2d Cir.1984). The arresting agents in this case could reasonably believe that one or more of the individuals within the apartment were armed. Indeed, the reasonableness of this belief was borne out by the discovery of a .380 semiautomatic handgun inside the apartment. The dangerousness of the situation was further increased by the presence of a dog. The dog, an attack Doberman pinscher, also posed a grave threat to the safety of the arresting agents.

*Factors Three and Four:*

Probable Cause and Reason to Believe the Suspects are in the Premises to be Searched

■ An arrest made without a warrant is unlawful unless it is made upon probable cause. *Dunaway v. New York,* 442 U.S. 200, 208 & n. 9, 99 S.Ct. 2248, 2254 & n. 9, 60 L.Ed.2d 824 (1979). Although the evidence necessary to support the existence of probable cause need not reach the level of evidence necessary to support a conviction, it must constitute more than rumor, suspicion, or a strong reason to suspect. *United States v. Fisher,* 702 F.2d 372, 375 (2d Cir.1983). In this Circuit, probable cause exists when the police have reasonably trustworthy information of facts and circumstances that are sufficient in themselves to warrant a person of reasonable caution in the belief that an offense has been or is being committed by the person to be arrested. *Id.* The presence of probable cause to arrest must be determined with reference to the facts of each case. *Id.* In the instant case, there can be no doubt of the probable cause to believe that the suspects within the apartment had committed a crime. The CI had been in the apartment minutes before the arrest and had been given a sample of cocaine. Furthermore, while in the apartment, the CI had seen four rectangular oblong plastic packages, each containing approximately one-half kilogram of cocaine.

The facts supporting probable cause in this case also support the agents' reasonable belief that the suspects were in the apartment. The CI had seen, and had dealt with, the suspects inside the apartment just minutes before the arrests were made.

*Factor Five:*

Likelihood of Escape if Suspects not Swiftly Arrested

■ A suspect who realizes he is in immediate danger of arrest is likely to flee or attempt armed resistance. *United States v. Flickinger,* 573 F.2d 1349, 1355 (9th Cir.), *cert. denied,* 439 U.S. 836, 99 S.Ct. 119, 58 L.Ed.2d 132 (1978); *United States v. Donaldson,* 606 F.Supp. 325, 332 (D.Conn.1985). In the instant case, the CI left the apartment for the professed purpose of testing the sample of cocaine given to him inside the apartment. If the agents did not act swiftly after the CI's departure, the suspicions of the suspects surely would have been aroused by the delay in the CI's return. *See United States v. Manfredi,* 722 F.2d 519, 522 (9th Cir.1983). Although the apartment was under surveillance, this is no guarantee that escape would be impossible. *See United States v. Donaldson,*

606 F.Supp. 325, 332 (D.Conn.1985). The apartment in question is on the ground floor level of 3820 Bailey Avenue. The agents knew there were at least three or four suspects inside the apartment. The fact that there were several suspects, and the fact that at least one window to the apartment was at street level certainly raised the likelihood of attempted flight.

Attempted flight may not have been the only consequence if the agents had failed to act promptly after the CI's departure. Their suspicions roused, the suspects may very well have destroyed the evidence. *See United States v. Manfredi*, 722 F.2d 519, 522 (9th Cir.1983). Furthermore, the agents could have reasonably assumed that the suspects were armed. *United States v. Figueroa*, 750 F.2d 232, 238 (2d Cir.1984). Every moment the agents delayed would have increased the likelihood of armed resistance to arrest. *United States v. Flickinger*, 573 F.2d 1349, 1355 (9th Cir.), *cert. denied*, 439 U.S. 836, 99 S.Ct. 119, 58 L.Ed.2d 132 (1978). By acting swiftly, the agents reduced the chances of flight, destruction of evidence, and the possibility of violence. Clearly, in the instant case, time was of the essence.

*Factor Six:*

The Peaceful Circumstances of the Entry

In *United States v. Gomez*, 633 F.2d 999 (2d Cir.1980), *cert. denied*, 450 U.S. 994, 101 S.Ct. 1695, 68 L.Ed.2d 194 (1981), the Second Circuit expressed its disapproval of forcible governmental intrusions into residences. *Id.* at 1006. In *Gomez*, the police sought to gain entry to an apartment by "kicking and banging on the door." *Id.* In the instant case, however, no such forcible intrusion existed. Noel Remy freely opened the apartment door to allow the CI and Undercover Agent Denehy in. It was only after Remy spotted Agent Averi and the other surveillance agents that the defendant tried to close the door and exclude the agents.

At this point, failure to prevent Remy from closing the door could have had disastrous results. If Remy had succeeded in closing the door and excluding the agents, he would likely have taken that opportunity to destroy the evidence. *See United States v. Martinez-Gonzalez*, 686 F.2d 93, 101 (2d Cir.1982). More importantly, the CI and Agent Denehy had stepped into the apartment before Remy tried to close the door. If Agent Averi had not forced open the door, there exists the possibility that the CI and Agent Denehy would have been isolated within the apartment. There, they would have been faced by four suspects, one handgun, and an attack dog. The need to protect the safety of the CI and Agent Denehy clearly called for immediate action.

B) Security Sweep

The facts of the instant case demonstrate the urgent need for an immediate and warrantless entry into Remy's apartment. Therefore, the entry was not in violation of the protections of the Fourth Amendment. Having found the initial entry lawful, this court must next examine the propriety of the search of the apartment.

■ When police officers have made a lawful arrest, they may make a cursory security sweep of the premises in which the arrest took place. *United States v. Gomez*, 633 F.2d 999, 1008 (2d Cir.1980), *cert. denied*, 450 U.S. 994, 101 S.Ct. 1695, 68 L.Ed.2d 194 (1981). The purpose of such a sweep is to determine if there are any additional persons present who might destroy evidence or pose a threat to the arresting officers. *See United States v. Escobar*, 805 F.2d 68, 71 (2d Cir.1986); *United States v. Gomez*, 633 F.2d at 1008; *United States v. Alonzo*, 542 F.Supp. 1312, 1316 (S.D.N.Y.1982). Although a security sweep is designed to search for persons rather than objects, *see United States v. Agapito*, 620 F.2d 324, 336 (2d Cir.), *cert. denied*, 449 U.S. 834, 101 S.Ct. 107, 66 L.Ed.2d 40 (1980), objects found in plain view during the sweep may be properly seized. *See United States v. Gomez*, 633 F.2d at 1008.

■ Under the plain view doctrine, "if, while lawfully engaged in an activity in a particular place, police officers perceive a suspicious object, they may seize it immediately." *Texas v. Brown*, 460 U.S. 730, 739,

103 S.Ct. 1535, 1542, 75 L.Ed.2d 502 (1983). Due to the exigent circumstances involved in this case, the arresting officers' entry into Remy's apartment was justified. Once inside, they were free to conduct a protective sweep of the premises. *See United States v. Gomez*, 633 F.2d at 1008.

 The defendants, however, contend that the items seized were in fact not within the plain view of the agents conducting the sweep. After consideration of the testimony offered at the evidentiary hearings held on December 23, 1986 and January 22, 1987, this court finds that the items[2] seized were in the plain view of the agents. Further, this court finds the security sweep was limited to its proper role of a cursory search for unknown additional persons. Accordingly, the motion to suppress the items seized from Remy's apartment is denied.

## MOTION FOR A BILL OF PARTICULARS

By her motion of August 28, 1986, defendant Liliana Vasquez requested *Brady* material, discovery pursuant to Rules 16 and 17 of the Federal Rules of Criminal Procedure, and a bill of particulars pursuant to Rule 7(f) of the Federal Rules of Criminal Procedure. Of these three requests, the former two have been responded to by the office of the United States

Attorney to the satisfaction of counsel for Vasquez. Consequently, this court need only address the request for a bill of particulars.[3]

 The purpose of a bill of particulars is to apprise a defendant of the essential elements of the crime with which she is charged. *United States v. Leonelli*, 428 F.Supp. 880, 882 (S.D.N.Y.1977); *see United States v. Salazar*, 485 F.2d 1272, 1278 (2d Cir.1973), *cert. denied*, 415 U.S. 985, 94 S.Ct. 1579, 39 L.Ed.2d 882 (1974). A bill of particulars is thus required only when the charges in the indictment are cast so generally that they do not advise the defendant of the specific acts of which she is accused. *United States v. Leonelli*, 428 F.Supp. 880, 882 (S.D.N.Y.1977). The indictment in this case is sufficiently detailed so that the defendant can adequately prepare a defense, avoid prejudicial surprise at trial, and raise any possible defense of double jeopardy. *See United States v. Varbaro*, 597 F.Supp. 1173, 1181 (S.D.N.Y.1984). Indeed, much of the information requested in the bill of particulars in this case is readily found in the indictment.[4]

A bill of particulars is not a discovery tool and is not intended to allow a defendant a preview of the evidence or the theory of the government's case. *See United States v. Culoso*, 461 F.Supp. 128, 134 & n.

---

2. Among the items found in plain view and subsequently seized was a calendar book. When found, the book was closed and its cover was free from any writing or markings. The seizure of this book was proper notwithstanding the fact that "some perusal [was] needed for the seizing agents to perceive the relevance" of the book to the crime. *United States v. Rega*, 496 F.Supp. 101, 104 n. 7 (S.D.N.Y.1980); *see United States v. Ochs*, 595 F.2d 1247, 1257 n. 8 (2d Cir.), *cert. denied*, 444 U.S. 955, 100 S.Ct. 435, 62 L.Ed.2d 328 (1979).

3. The bill of particulars inquired:
 "1. With respect to each defendant named herein, set forth the precise manner and means by which it is alleged he did combine, conspire, confederate, and agree....[sic] to violate the enumerated narcotics laws. With respect to any such occasion, specify the date, time, place and circumstance and specify where in the Eastern [sic] District of New York such acts occurred. Specify the occasions on which, as well as dates,

times, places and circumstances under which, any defendant conspired with any other known individual. Specify a physical description of such individuals, their present identities if now known and the dates, times, places and circumstances under which these individuals conspired with the defendant.
 2. Set forth with regard to each defendant the precise manner and means by which it alleged [sic] that the defendant in question possessed with intent to distribute quantities of cocaine. With respect to each defendant state whether it is alleged that he possessed or distributed cocaine, as well as the date(s), time(s), places(s) and circumstances under which such possession took place.

4. For example, although such information is substantially present in the indictment, the bill of particulars inquires "[w]ith respect to each defendant state whether it is alleged that he possessed or distributed cocaine, as well as the date(s), time(s), place(s) and circumstances under which such possession took place."

8 (S.D.N.Y.1978), *aff'd mem.*, 607 F.2d 999 (2d Cir.1979). Further, the government has no duty to disclose the precise manner in which the crimes alleged in the indictment were committed. *See United States v. Andrews*, 381 F.2d 377, 377–78 (2d Cir. 1967) (per curiam), *cert. denied*, 390 U.S. 960, 88 S.Ct. 1058, 19 L.Ed.2d 1156 (1968); *United States v. Leonelli*, 428 F.Supp. 880, 882 (S.D.N.Y.1977). Accordingly, the motion for a bill of particulars is denied.

## CONCLUSION

The motion to suppress the evidence seized from 3820 Bailey Avenue, Apt. 1E, Bronx, New York on July 24, 1986 is denied. The motion for a bill of particulars is denied.