[667 NYS2d 23]

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v WILLIAM HALLMAN, Appellant.

First Department, December 23, 1997

## APPEARANCES OF COUNSEL

*Paul Liu* of counsel, New York City *(Daniel L. Greenberg,* attorney), for appellant.

*Maura E. Daly* of counsel *(Eleanor J. Ostrow* on the brief; *Robert M. Morgenthau, District Attorney* of New York County, attorney), for respondent.

## OPINION OF THE COURT

Tom, J.

In the early morning hours of August 1, 1993, several gunshots were fired into the window of an Upper East Side bar, the "Mill Bar", located on the corner of 83rd Street and York Avenue. At approximately 4:30 A.M., Police Officer Michael Hernandez and his partner, responding to a radio run of shots fired, met bar bouncers Douglas Bantum and Melvin Johnson at the subject location. After viewing the shattered window, the officers recovered a .45 caliber shell casing from the ground; numerous more spent casings were subsequently recovered from the scene. Bantum and Johnson told the officers that a white male wearing a red shirt and khaki pants had just fired shots at them through the bar window and ran south on York Avenue. Officer Hernandez then went across the street to speak to a hot dog vendor. In addition to corroborating the bouncers' account, the witness gave further descriptive details, that the shooter was "older" and carried a cane, and directed

the officers across the street to 1555 York Avenue into which the gunman had entered.

When the officers arrived in front of that building, a neighborhood resident known to them confirmed that a man wearing a red shirt and khakis had entered that building. He directed the officers to the "second or third floor." Hernandez and another officer entered the building, ascended to the second floor, walked through a vacant apartment and onto the fire escape. As they started to ascend, they observed an ashtray containing a burning cigarette by an open third floor window, indicating a person's recent presence near the window. Since the officers pursued an armed man, guns were drawn. As Hernandez ascended to the open window, he shined his flashlight into the darkened apartment. He observed a prone man in boxer shorts on the floor, with an arm concealed under a quilt. He then observed a red shirt and khaki pants on the nearby couch, and a cane slung from a door knob. Hernandez called out "This is the police, do me a favor, get up," to which no immediate response was made. When defendant responded after another call from the officer, Hernandez entered through the window and withdrew the hand from concealment; no gun was found under the blanket. Defendant asked, "Where's my nephew." Hernandez then warned his partner to be careful because someone else might be in the darkened apartment. Concerned for his safety, Hernandez asked where was the gun. Defendant denied having a gun. The gun later was recovered from above a closet's doorjamb.

Moments later, defendant was identified by the bouncers from the bar, who had been escorted to the apartment by police. During postarrest precinct questioning, defendant indicated that, earlier that night, he "had been troubled with some of the problems they had been having at the bar," including a group of youths breaking into, and smashing the windows of, cars parked on the corner. Waiting until most of the bar patrons had left later in the evening, he fired shots through the bar window and then, prior to reentering his apartment, fired some more shots.

Defendant was charged in the indictment with two counts of attempted murder, and one count each of reckless endangerment, criminal possession of a weapon in the second degree and criminal possession of a weapon in the third degree.

At trial, two bartenders indicated that they and another employee had been just inside the window. They ducked as the shots were fired, after which two more shots followed. Bantum

and Johnson testified that they had followed defendant a short distance as he left the crime scene. Defendant then fired additional shots at them from about 35 feet away, after which they broke off the pursuit. Police arrived only a minute or so later. Defendant, testifying at trial, indicated that he was a heavy drinker and alluded to past friction between neighborhood residents and bar patrons. Having been woken up by noise from the bar, he loaded his gun with a full clip of six bullets to "take care of" the noise. After arriving in front of the bar, he proceeded to fire one shot in the air. In his postarrest statement, he indicated that when he saw employees in the bar, he fired two or three shots into its window. Before reentering his building, he fired another shot at bar employees to discourage them from following him. When police arrived at approximately 5:00 A.M., defendant was lying on the floor to alleviate back problems. On April 18, 1994, the trial court found defendant guilty of both weapon possession counts, but acquitted him of the attempted murder and reckless endangerment charges. Defendant subsequently was sentenced as previously noted.

On appeal, defendant contends that the officers' warrantless entry both onto the fire escape and into his apartment was unlawful and, as a result, the physical evidence found in the apartment, his statements and identifications should all have been suppressed.

The primary focus of defendant's argument is on the propriety of police entry onto the fire escape, from which they could view certain incriminating evidence and defendant's appearance in the apartment. Although this issue is unpreserved (CPL 470.05 [2]; *People v Gonzalez*, 55 NY2d 887), even if we considered the merits, we would reject it. Our recent ruling in *People v Funches* (222 AD2d 218, *affd* 89 NY2d 1005) requires rejection of the challenge to the officers' arrival on the fire escape and defendant's expectation of privacy therein. The officers had ample reasonable suspicion, based on the inspection of the crime scene and statements from several eyewitnesses, as a predicate to their ascension to defendant's floor via the fire escape, in which defendant had only a diminished expectation of privacy (*supra*), from which vantage they acquired probable cause to make the arrest. Even if reviewed under Federal constitutional standards, a fire escape is deemed to be a common area on which police may be present without the authority conferred by a warrant (*United States v Arboleda*, 633 F2d 985, 992 [2d Cir 1980], *cert denied* 450 US 917).

As to the lawfulness of the police entry into defendant's apartment through an open window, a warrantless arrest and seizure in a home may be justified on the basis of exigency. A finding of exigency requires consideration of the gravity of the offense, the suspect's possession of and willingness to use a gun and the likelihood of his attempting to escape (*People v Mealer*, 57 NY2d 214, *cert denied* 460 US 1024; *People v Burr*, 70 NY2d 354, *cert denied* 485 US 989). Exigency has been found when police, possessing a description, entered the hotel room of a killing suspect who had had a prior gun arrest. The description, the location, the seriousness of the crime and the suspect's apparent dangerousness all militated in favor of exigency, despite the absence of apparent flight (*People v Mealer, supra*). Exigent circumstances also have been found to exist when police, responding to an assault, discovered the victim badly beaten and had reason to believe that the perpetrators might be armed and dangerous based on the nature and viciousness of the attack to justify their warrantless entry into the basement apartment to which defendant and his accomplices had fled (*People v Graham*, 161 AD2d 836, *lv denied* 76 NY2d 788). The killing of an elderly victim was sufficiently grave, coupled with information that defendant might have a handgun, to constitute exigency, despite only equivocal indications of possible flight (*People v Cartier*, 149 AD2d 524, *lv denied* 74 NY2d 737). By contrast, exigency did not exist when police had no reasonable basis to conclude that the burglary suspect was armed, and his escape from the premises, undetected, was unlikely (*cf., People v Bero*, 139 AD2d 581). Although the present case does not, strictly speaking, involve close pursuit (*see, e.g., People v Dominguez*, 141 AD2d 833 [robbery/assault/kidnapping suspect's flight into his house constituted exigency]), it bears relevance that the police response was in close proximity to the shootings.

In the case at bar, the facts clearly manifested sufficient exigency to have supported the officers' warrantless entry into defendant's apartment as they responded to the crime scene. Here, the officers were responding to a violent crime involving the firing of shots from a high caliber gun into a bar occupied by employees. It was entirely fortuitous that this was not a homicide. Since the shooting had just occurred and the perpetrator ran into a nearby building, the officers had to assume that the gunman was still armed and dangerous. Further, there was ample evidence to support the officers' belief that defendant was the perpetrator since the gunman was seen entering

the building in issue and the clothing on defendant's couch and the cane by the doorway matched the description given by eyewitnesses. All factors in this case provide a clear showing of probable cause. The police response and subsequent entry, by contrast, was relatively nonviolent (see, *People v Cruz*, 149 AD2d 151). Although, unlike *Funches*, no handgun was observed in plain view through the window, information possessed by these officers, as in *Funches*, supported the officers' fear of imminent violence directed at them or others that would not have been ameliorated as officers applied for and obtained a warrant. In this respect, it bears repeating that defendant was observed lying on the floor of his darkened apartment with his hand, which may have held a weapon, concealed underneath a quilt.

Although the dissent pictures a sleeping man, incapable of being an immediate instrumentality of violence, lost to somnolence, that much is speculative. Defendant's own statement suggests that he was not asleep. Police testimony indicates that defendant only appeared to be asleep—whether feigned or not. Responding police knew that he exactly matched the description of a man who had just fired several shots through a window into what, at most other hours, would be a crowded public meeting place. Moreover, defendant was found in the general location to which the shooter had fled. Under these circumstances, the possibility that defendant might appear to be asleep was less important than the observation that his hand was concealed in the dark under a blanket. While no gun was hidden under the blanket, that fact does not alter the potentially lethal image presented to the officers upon their immediate arrival, underscoring the actual restraint of their response. The gun that eventually was recovered from above a closet's doorjamb was suppressed, and does not factor into our analysis.

The dissent further concludes that exigency is defeated insofar as the defendant could not likely escape. However, the risk of flight is only one factor, and not an exclusive factor, in evaluating exigency, and by relying on a conclusion that defendant would not have fled—which also may be speculative—the dissent overlooks the significant possibility of a violent response by a forewarned and alert suspect. Further, although defendant testified that he had only wanted to make a point, and had not wanted to hurt anyone, even if that testimony is credited, it is irrelevant to the present inquiry. The focus of the analysis is not on whether defendant would have used

violence against responding police or others, but whether the officers reasonably believed that he might do so, justifying the immediate police entry without the necessity of securing an arrest warrant. Here, the description, the location, the seriousness of the offense and defendant's apparent dangerousness all militated in favor of the warrantless entry despite the absence of evident flight.

The dissent also relies on the passage of a half hour in time to deflate the urgency usually associated with exigency. However, our review of the evidence underscores, rather than undermines, the temporal brevity of the officers' response. From initial response to eventual apprehension, no gaps in time or in efforts broke the continuity of the fast-breaking investigation and pursuit of a presumably armed and dangerous, and potentially irrational, perpetrator.

█ Defendant's claim that the trial court engaged in premature deliberations requires preservation, and was not preserved for appellate review (*People v Lloyd*, 210 AD2d 163, *lv denied* 85 NY2d 864). In any event, the court properly proceeded in accordance with CPL 320.20 (3), and did not engage in premature deliberations by indicating that "its analysis of the case was continuous as the evidence unfolded" (*supra*). We have considered defendant's remaining contentions and find them to be meritless.

Accordingly, the judgment of Supreme Court, New York County (John Bradley, J.), rendered May 10, 1994, convicting defendant, after a nonjury trial, of criminal possession of a weapon in the second and third degrees, and sentencing him to concurrent terms of 2 to 6 years and $1^1/_2$ to $4^1/_2$ years, respectively, should be affirmed.

MURPHY, P. J. (dissenting). At the suppression hearing, Police Officer Michael Hernandez testified that he and another officer named Reynolds first observed defendant through the open window of defendant's third floor apartment at 1555 York Avenue. The officers' vantage point was the fire escape landing just outside of the apartment. Hernandez and Reynolds had arrived upon the fire escape landing after receiving information from several persons which, taken cumulatively, indicated that a man who had about a half hour earlier fired several gunshots into a local bar called "The Mill", might be found in one of 1555 York Avenue's second- or third-floor apartments. As is here relevant, the man had been described to the officers as being on the "older" side, and attired in a red shirt and khaki pants. It was also reported that he carried a cane.

As viewed from the fire escape with the aid of a flashlight in the darkness of early morning, the defendant appeared to the officers to be asleep on the floor. He was clad only in boxer shorts and a tank top shirt and had one hand under a quilt. Near defendant on a couch the officers spied a red shirt and khaki pants and on a doorknob hung a cane. After calling out to defendant repeatedly, the officers finally managed to rouse him and thereupon entered the apartment through the open window. Once inside, they arrested him at gunpoint. Although no weapon was found on or near defendant in the immediate aftermath of the arrest, a search of the apartment conducted in the ensuing half hour by officers other than Hernandez and Reynolds resulted in the discovery of a pistol on a closet shelf. Also shortly after the arrest, two employees from "The Mill" were brought by the police to view defendant in his apartment; both identified him as the person who had fired the shots into the bar. Later on the day of the arrest, defendant made two inculpatory statements.

The suppression court found the warrantless arrest of defendant in his apartment sustainable, reasoning that the arresting officers, based on the leads they had been given, were justified in concluding that defendant was probably the person who had fired the shots into "The Mill" and that, if he was, he would have only recently returned to his apartment, the shots having been fired only about a half hour before, and might still be armed and dangerous. This, thought the court, constituted exigency sufficient to excuse the officers' failure to obtain an arrest warrant. Having upheld the arrest, the court found admissible the physical evidence seized in its immediate aftermath (defendant's red shirt and khaki pants) and the showup identifications by the bar employees. The gun discovered in the subsequent warrantless search of the apartment, however, was suppressed upon the court's finding that at the time the apartment was searched there was neither exigency nor consent to support a dispensation from the requirement of a search warrant. Respecting defendant's inculpatory statements, the court deemed both admissible upon the unelaborated ground that they did not result from improper police conduct.

Following a nonjury trial at which all of the aforementioned evidence except the gun was received, defendant was convicted of criminal possession of a weapon in the second and third degrees.

I respectfully dissent from the majority's determination to affirm the judgment convicting defendant and would reverse

and remand the matter for a new trial because I believe the warrantless arrest of the defendant in his home to have been illegal and, accordingly, that suppression ought to have been granted, at least as to the physical evidence seized just after the arrest and the showup identifications, and possibly also as to the witnesses' proposed in-court identifications and the inculpatory statements of the defendant.

Although New York's Legislature and courts once were of the view that a suspect might be legally arrested in his or her home without a warrant provided only that the arrest was supported by probable cause and accompanied by certain protocols (*see, People v Payton*, 51 NY2d 169), it is by now well established that that view was in error (*Payton v New York*, 445 US 573, *revg* 45 NY2d 300). Indeed, in the course of its decision in *Payton (supra)*, declaring unconstitutional various provisions of New York law that had permitted warrantless and nonconsensual arrests within a suspect's home upon a retrospective showing of little more than probable cause, the United States Supreme Court observed pointedly: "The Fourth Amendment protects the individual's privacy in a variety of settings. In none is the zone of privacy more clearly defined than when bounded by the unambiguous physical dimensions of an individual's home—a zone that finds its roots in clear and specific constitutional terms: 'The right of the people to be secure in their * * * houses * * * shall not be violated.' That language unequivocally establishes the proposition that '[at] the very core [of the Fourth Amendment] stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.' *Silverman* v. *United States,* 365 U. S. 505, 511. In terms that apply equally to seizures of property and to seizures of persons, the Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant" (*Payton v New York, supra,* at 589-590).

There is no dispute that Officers Hernandez and Reynolds entered defendant's home and arrested him without a warrant. Nor is it disputed that the somnolent defendant did not consent to their entry. It follows then that defendant's arrest was illegal unless there was some exigency to excuse the failure of the arresting officers to obtain a warrant.

In assessing whether exigency has been established it is important to bear in mind that "[b]ecause 'physical entry of the home is the chief evil against which the wording of the

Fourth Amendment is directed' (*United States v United States Dist. Ct.*, 407 US 297, 313), defendant has no burden to show he had an 'expectation of privacy' in his apartment" (*People v Levan*, 62 NY2d 139, 144). Indeed, "searches and seizures inside a home without a warrant are presumptively unreasonable" (*Payton v New York, supra,* at 586), and for that reason the burden of demonstrating exigency sufficient to justify warrantless domestic intrusion rests squarely with the People (*Welsh v Wisconsin*, 466 US 740, 749-750; *United States v Parr*, 716 F2d 796; *Johnson v Havener*, 534 F2d 1232, *cert denied* 429 US 889; *United States v Murrie*, 534 F2d 695; *United States v Cattouse*, 666 F Supp 480, *affd* 846 F2d 144, *cert denied* 488 US 929; *United States v Evans*, 629 F Supp 1544; *People v Cruz*, 149 AD2d 151, 159). The subject evidentiary burden has been described in the cases as "heavy" (*Welsh v Wisconsin, supra,* at 749-750, citing *United States v United States Dist. Ct., supra,* at 318) and possible of satisfaction only where it can be clearly established that there was some " 'urgent need' " necessitating immediate action (*United States v Crespo*, 834 F2d 267, 270, *cert denied* 485 US 1007; *United States v Martinez-Gonzalez*, 686 F2d 93; *United States v Reed*, 572 F2d 412, *cert denied sub nom. Goldsmith v United States,* 439 US 913)—that the wait for a warrant would have been prohibitively dangerous to person or property or facilitative of a suspect's flight or destruction of evidence. The stringency of this requirement reflects the considered judgment that a less exacting evidentiary demand would soon elevate the exception above the rule and in so doing reduce the constitutionally mandated interposition of a neutral Magistrate between the police and the domestic threshold (*see, Johnson v United States*, 333 US 10, 13-14) to little more than "a form of words". Courts then have generally been circumspect in evaluating prosecutorial claims of exigency and have "recognized only a few such emergency conditions" (*Welsh v Wisconsin, supra,* at 750).

Turning now to the matter at bar, the People, in attempting to satisfy the above-described burden, place heavy emphasis on the seriousness of the recent misconduct of which defendant was suspected and upon the fact that the police, as they entered defendant's apartment, clearly had probable cause to make an arrest. These circumstances, however, persuasively established though they may be, are not to be equated with exigency for "no exigency is created simply because there is probable cause to believe that a serious crime has been committed" (*Welsh v Wisconsin, supra,* at 753; *see also, People v Cruz, supra,* at 160;

*United States v Cattouse, supra,* at 483). Probable cause to believe that a serious crime has been committed, although doubtless indispensable to the justification of a warrantless and nonconsensual intrusion by police into a suspect's home (*Welsh v Wisconsin, supra*), does not constitute a sufficient ground therefor. There must in addition be a showing that such wait as there would have been for issuance of a judicial warrant entailed the countenance of some grave and imminent peril. I would have thought it clear that no such showing was made in this case. Soundly asleep in his underclothes under the watchful eye of two armed police officers, the somewhat elderly and, apparently, somewhat lame defendant manifestly posed no immediate threat to person, property or evidence. Nor does common sense permit the inference that the defendant, who appeared simply to have walked home from the scene of the shooting, gotten undressed and gone to sleep, had the slightest intention of fleeing. But, even if the defendant, as he lay half clad on his apartment floor, dreamt of flight, reality would already have overtaken his fantasy. With two armed police officers a few feet away surveilling him from the fire escape landing and several other officers positioned just outside of the building in which his apartment was situated, the defendant had no real prospect of escape. Given the deployment of the police officers, the possibility of escape would have been minimal even if defendant had been young, fit, awake and dressed; as he was—elderly, lame, asleep and attired only in his underwear—it was virtually nil.

To be sure, the arresting officers as they climbed the fire escape leading to defendant's apartment might well have feared from their suspect some near repetition of the apparently indiscriminate gunfire of the previous half hour, and these concerns, if unqualified, might certainly have supported a finding of exigency. Whatever legitimate fears the officers may have had respecting imminently renewed violence, however, ought to have been substantially neutralized when they spotted their quarry asleep upon the floor of his apartment. Obviously, the defendant, as he lay there inert under their gaze and, indeed, their guns, presented no imminent risk. Given the entirely innocuous tableau before them, it ought to have been clear to the officers that there was no need for an immediate arrest. There was, in short, no reason why an arrest warrant could not have been obtained by one of the numerous officers by then at the scene while their cornered and closely monitored suspect slept.

I know of no case—and certainly none is cited by the People—in which the People's "heavy burden" of proving exigency sufficient to support the warrantless arrest of a suspect within his home was deemed satisfied upon so flimsy a factual predicate. Nor do I think it an exaggeration to observe that if a situation such as the one confronting the arresting officers in this case is to be characterized as exigent, we have gone a long way toward the practical elimination of the requirement of a warrant to authorize the nonconsensual entry of police into a home. If a solitary, sleeping suspect surrounded and scrutinized by numerous vigilant police officers is a circumstance that can be described as instinct with "exigency", one can only wonder whether there remains any set of circumstances sufficiently benign to merit enforcement of the Constitution's warrant requirement. Indeed, if the warrant requirement is to be so easily excepted to where the police object is entry of the home, the precinct whose privacy the Constitution purports to safeguard most particularly, it is fair to ask whether there remains any threshold that the police may not cross without prior judicial authorization or, in other words, whether the warrant requirement has not, practically speaking, been relegated to the status of a vestigial curiosity. In ceding so much discretion to law enforcement officers, we default in the performance of the responsibility constitutionally committed to us as members of the judicial branch of government effectively to mediate between the sometimes capacious demands of law enforcement and the not infrequently competing need of a free people to transact the often properly private endeavors of daily life without unnecessary governmental intrusion. As Justice Jackson, writing for the Court in *Johnson v United States (supra,* at 13-14), so trenchantly observed: "The point of the Fourth Amendment, which often is not grasped by zealous officers, is not that it denies law enforcement the support of the usual inferences which reasonable men draw from evidence. Its protection consists in requiring that those inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime. Any assumption that evidence sufficient to support a magistrate's disinterested determination to issue a search warrant will justify the officers in making a search without a warrant would reduce the Amendment to a nullity and leave the people's homes secure only in the discretion of police officers. Crime, even in the privacy of one's own quarters, is, of course, of grave concern

to society, and the law allows such crime to be reached on proper showing. The right of officers to thrust themselves into a home is also a grave concern, not only to the individual but to a society which chooses to dwell in reasonable security and freedom from surveillance. When the right of privacy must reasonably yield to the right of search is, as a rule, to be decided by a judicial officer, not by a policeman or government enforcement agent". It is respectfully submitted that this case presents no occasion to except to this basic rule. To do so upon the facts before us signals no less than our acquiescence in an alienation of a decisional prerogative that it is our constitutional responsibility as Judges to retain.

If, as I believe, the warrantless arrest of the defendant was illegal, it follows that the evidence seized as a direct consequence of the arrest, namely, defendant's clothing and the showup identifications by the bar employees, must be suppressed (*Wong Sun v United States*, 371 US 471). And, in advance of the new trial required if only because of the receipt of evidence at the first trial of the tainted showup identifications (*People v Gethers*, 86 NY2d 159) there must be a hearing to determine whether there is a reliable source independent of the tainted showup procedure for any in-court identifications to be made of the defendant by the bar employees (*supra*). Finally, as to defendant's inculpatory statements, a hearing should be held to ascertain whether they are sufficiently attenuated from the illegal arrest to avoid suppression (*see, People v Harris*, 72 NY2d 614, *revd on other grounds* 495 US 14). In this latter connection I would note that even if, as the suppression court seems to have found, there was no conduct by the police violative of the Fifth Amendment, there was in this case a most serious species of Fourth Amendment violation and so far as can be told from the present record little but time intervening between that violation and the first of defendant's inculpatory statements. Further complicating a finding of attenuation in this case is the circumstance that defendant's statements to the police were preceded by the tainted showup identifications by the bar employees. Without prejudging the matter, it would seem to me very difficult to separate defendant's knowledge of the fact that he had already been culpably identified from his decision but a few hours later to confess to the police.

Accordingly, the judgment of the Supreme Court, New York County (John Bradley, J.), rendered May 10, 1994, convicting defendant, after a nonjury trial, of criminal possession of a

weapon in the second and third degrees, should be reversed, defendant's suppression motion granted as to the physical evidence seized at the time of his arrest and the showup identifications, and the matter remanded for a new trial to be preceded by an independent source hearing and a hearing to determine whether defendant's statements are sufficiently attenuated from his illegal arrest to be admitted in evidence at trial.

SULLIVAN and NARDELLI, JJ., concur with TOM, J.; MURPHY, P. J., dissents in a separate opinion. Judgment, Supreme Court, New York County, rendered May 10, 1994, affirmed.